W. H. HURLEY, Respondent, v. THE MISSOURI, KANSAS & TEXAS RAILWAY COMPANY, Appellant.

Kansas City Court of Appeals, April 7, 1913.

1. **PLEADING: Negligence: "Deliberately:" Sufficiency: Demurrer: Waiver.** A petition alleging facts sufficient to raise an inference of either negligence or wilfulness and that the wrongful acts were done "deliberately," is sufficient after verdict, since the word "deliberately" so used implies an intentional purpose to do such wrongful acts; and a demurrer to such petition, based on omission to allege negligence or wilfulness, is waived by answering over.

2. **DAMAGES: Interference with Extinguishment of Fire: Explosives: Evidence.** A fire hose laid across a railroad track conducted water to a fire adjoining the track. A heavy train containing a large quantity of explosives approached so close that there was imminent danger of an explosion, which would do great damage. The train could not back out because of the grade of the track. The engineer threatened and prepared to run over the hose unless instantly removed. The

hose was removed by the firemen while the train was passing, and increased damage to the burning building resulted. There was evidence that the engineer had notice of the hose in time to have stopped in a safe place, and knew he could not back his train if he approached closer. *Held*, that the evidence was sufficient to support a verdict for the increased loss caused by the removal of the hose.

Appeal from Henry Circuit Court.—*Hon. C. A. Denton*, Judge.

AFFIRMED.

*J. A. Gilbreath* and *Lee W. Hagerman* for appellant.

(1) The petition states no cause of action. There is no allegation of negligence in respect to any of the acts of defendant's servants alleged in the petition. There is no allegation of wantonness. There is no allegation that the acts done by the defendant's servants were wrongful. There is nothing to point out to the court or to the defendant what is the wrong charged. This is a petition intended to sound in tort, yet it contains a mere recital of facts and without direct charge of a wrongful act, states the supposed consequences of those acts and invokes liability. Such an allegation does not constitute a cause of action. Rawson v. Railroad, 129 Mo. App. 613; McCarty v. Hotel Co., 144 Mo. 397; and authorities below. (2) The plaintiff failed to make out a case of coercion because he failed to show that the act of the fire chief was not done of his own free will, and failed to show the essential element which would make out a case of duress or coercion by threats. State v. Darlington, 53 N. E. (Ind. 1899), 925; Radich v. Hutchins, 95 U. S. 213; Sillman v. U. S., 101 U. S. 465; Jones v. State, 10 Tex. App. 552; Brumagrin v. Tillinghast, 18 Cal. 265; Mays v. Cincinnati, 1 Oh. St. 268; Mayor of Baltimore v. Jefferman, 4 Gill (Md.), 425; Payne v. Rail-

road, 49 Am. Rep. (Tenn.), 666; Newhall v. Jordan, 149 Fed. 586; Railroad v. Const. Co., 33 So. (La.), 51, 55; Morse v. Woodworth, 155 Mass. 233, 250; Falney v. County Commrs., 76 Minn. 257; Maisonaire v. Keating, 16 Fed. Cas. 513-517; Shuck v. Loan Assn., 41 S. E. 28, 31; Knapp.v. Hyde, 60 Barb. 80; Hines v. County Commrs., 93 Ind. 266.

*C. C. Dickinson & Son,* and *Parks & Son* for respondent.

(1) If the employees in charge of a railroad train, or street car, have notice, or by the exercise of reasonable care, might have such notice, that the operation of such train or car, will interfere with the discharge of the duties of firemen in the extinguishment of a fire, and notwithstanding such notice, so operate such train or car as to hinder and hamper the firemen in the discharge of their duties, whereby the fire, which otherwise could have been extinguished, destroys one's property, such negligent conduct will render the railroad company liable to the one whose property is destroyed. Compression Casting Co. v. Railroad, 109 Mass. 277, 12 Am. St. Rep. 689; Traction & Electric Co. v. McCaskill, 75 Ark. 133, 86 S. W. 997, 112 Am. St. Rep. 48; Houren v Railroad, 236 Ill. 620, 86 N. E. 611, 20 L. R. A. (N. S.) 1113, et seq.; Railroad v. Scruggs, 49 So. 399, 23 L. R. A. (N. S.) 184; Kiernan v. Metropolitan Co., 170 Mass. 379, 49 N. E. 648; note 12 L. R. A. (N. S.) 384. (2) To sustain demurrer to the petition on the ground that it does not state facts sufficient to constitute a cause of action, the statement of facts must be such that, admitting all of them to be true, the court is authorized to say that they furnish no cause of action. Darby v. Cabanne, 1 Mo. App. 126; Ferguson v. Davidson, 65 Mo. App. 193; State v. Carroll, 63 Mo. 156; State ex rel. v. Berger, 92 Mo. App. 639; Typewriter Co. v. Realty Co., 118 Mo. App.

207; Eads v. Gaines, 58 Mo. App. 594. (3) No principle of law is better stated than that by a demurrer to a petition all material facts alleged therein for the purpose of the demurrer are admitted as being true and it is only where the petition is so "wholly wanting in necessary averments that it .fails to state a cause of action" that it is demurrable. Verdin v. City of St. Louis, 131 Mo. 75; Dodson v. Lomax, 113 Mo. 555; McKenzie v. Mathews, 59 Mo. 99; Butler v. Lawson, 72 Mo. 227; State ex rel. v. Carroll, 63 Mo. 156. (4) A demurrer on the ground that the petition does not state facts sufficient to constitute a cause of action is confined to that objection .and does not reach any defect, imperfection, or uncertainty in the pleadings if a cause of action is stated. Eads v. Gaines, 58 Mo. App. 586; Taylor v. Penquite, 35 Mo. App. 389; Ferguson v. Davidson, 65 Mo. App. 193; Cockerill v. Stafford, 102 Mo. 57; McAdam v. Scudder, 127 Mo. 345.

TRIMBLE, J.—Action for damages alleged to have been caused by defendant's interference with firemen in their endeavor to extinguish a fire in plaintiff's mill and elevator, combined in one building and standing on the east side of and immediately adjoining defendant's railway track in the city of Clinton.

The south line of the building was forty feet north of the north line of Ohio street, which ran east and west. The fire originated near the ground on the south side not far from the southeast corner, and began about 8:30 p. m., February 17, 1909. Responding at once to the alarm, the city fire department ran two blocks from its headquarters to a water plug on the west side of the railroad, being the plug most convenient to the seat of the fire and from which it could be best reached and most effectively fought. Here a hose was attached and laid along Ohio street across defendant's track to the fire, and a. stream began play-

Hurley v. Railroad.

ing on the flames. Hose were also finally attached to three other plugs but they could not be used so effectively in fighting the fire as the hose from the first plug. The hose from the second plug could not be used with much effect because of buildings being in the way and also because the water would be thrown against the wind which would prevent a successful fight. The third plug was so far away the hose was not long enough to reach the fire and the fourth was still further away and difficult of access, and was not attached until after the train had gone.

Shortly after the laying of this first hose across the track, a freight train from the northeast entered the city, passed about a mile through its confines, and approached the fire at a speed of from four to six miles per hour.

It is plaintiff's contention that the engineer was warned of the situation and of the hose across the track, and requested to stop, in plenty of time for him to have stopped before the train got near enough to the building to be in danger of the fire; but that he refused to heed said warning, or to stop as requested, but came on down till the engine was close to the fire and then by threats that, if the hose were not removed, he would run over it and cut it to pieces, compelled the fire chief to shut off the water, disconnect the hose and allow the train to go by; and that during this delay in fighting the fire, it got beyond control and caused much greater loss than would have happened otherwise.

Defendant's claim is that the engineer had no warning to stop until he was so close to the building as to be in danger of the fire; that he stopped and endeavored to back the train but was unable to do so because of the length and weight of his train and the fact that it extended back around a curve and up a steep grade; that when the trainmen found they could not back out of the danger, they told the fire chief

there were explosives on the train sufficient to blow
up the town, and that the train must go through, and
thereupon the chief, acting upon his own judgment and
in the interest of all, and not through coercion, or-
dered the hose disconnected and let the train go by.
Defendant further contends that the fire was never at
any time under control and that the loss would have oc-
curred had no train gone by.

The petition is attacked as being insufficient. A
demurrer thereto was overruled, and the defendant
answered and went to trial. The basis of the attack is
that the petition does not charge that the acts of de-
fendant were done negligently or wilfully. It does not
use those words, but it does state facts which on their
face are sufficient to raise an inference of either. And
when, in addition to these facts, it says the acts were
done "deliberately" this makes a sufficient charge of
wilfulness, since that word, when used in the connec-
tion in which it is in this case, connotes an intentional
purpose to do a wrongful thing. If, on the facts
pleaded, the law raises an inference of negligence or
wilfulness, it is unnecessary to formally charge the
negligence or wilfulness. [Dyer v. Railroad, 34 Mo.
127; Keeton v. Railroad, 116 Mo. App. 281, 287; Raw-
son v. Railroad, 129 Mo. App. 613, 616.] But because
it is so held is not a good reason for leaving out words
which plainly charge either negligence or wilfulness
according to whichever one is applicable to the facts.
To put in either one that is applicable involves no time
nor labor; while to leave it out invites attack and con-
sumes much time and labor in both the trial and ap-
pellate courts in passing on the question raised. In
this case the petition was certainly sufficient after ver-
dict to support the judgment, and hence the demurrer
was waived by answering over. [Cunningham v. Wa-
bash Ry. Co., 149 S. W. 1151; Hoffman v. Transit Co.,
213 Mo. 445.]

The question that next presents itself is, can the defendant be held liable, under the facts, on any theory? It would seem that if one knowingly interferes with the efforts of those engaged in putting out a fire, and such interference directly results in a greater loss by the fire than would have been otherwise sustained, such person ought to be held liable. And if such person, after full knowledge of the facts and the situation, negligently or wilfully conducts himself so as to cause an interference directly resulting in loss, he ought to be held liable.

In Metallic Compression Co. v. Railroad, 109 Mass. 227, a hose had been laid across a track, the water was, by means of the hose, being applied to the fire, and had diminished it, and would probably have extinguished it in a short time but for the acts of the defendant. At that time a freight train came along, and though its managers had sufficient notice and warning, and might have stopped, they carelessly ran over the hose and severed it. It was held that the firemen had a right at common law to lay the hose across the track, that the severing of the hose was the proximate cause of the destruction of the building, and that defendant was liable.

In Little Rock Traction Co. v. McCaskill, 75 Ark. 133, plaintiff's house was burning in the night and three streams of water were playing on it, one from a hose lying across a street car track. There was no reason why the motorman could not have seen it for a long distance. He denied seeing it but says he watched the fire as he came near. The car cut the hose, causing greater loss than would have been sustained had it not been cut. The defendant was held liable.

In American Sheet, etc., Co. v. Pittsburgh Ry., 12 L. R. A. (N. S.) 382, l. c. 386 it is said: "It is not denied that a natural person, or a corporation by its corporate agencies, may so interfere with the rights

of another, growing out of the emergency of a fire or conflagration of or on such other person's property or premises, as to make him or it liable for injury and damage directly resulting from such interference. Actionable interference of this kind is the violation of a fundamental social duty, and is within the definition of a common law tort. Private property may be entered by the public authorities, or by the person, or his agents, who is owner of a burning property, for the purpose of using reasonable means to save the same or extinguish the fire; and undoubtedly in the case now before us, the plaintiff's employees, as well as the public firemen, had the right to cross the right of way and tracks of the defendant company for the purpose of leading the hose from the source of supply to the burning building. In such a case, the exclusive control of private property is subordinate to the exigencies of public safety and private necessity, and legal sanction is given in such a case to the requirements of morality and social duty.'' And it was announced in that case that a railroad company should be held liable for loss for what turns out to be an interfering use of its own property, provided it is notified or informed of the conditions which make such use an interfering one. To the same effect also is Louisville · Ry. Co. v. Scruggs, 23 L. R. A. (N. S.) 184.

In Erickson v. Great Northern Ry., 117 Minn. 348, 39 L. R. A. 237, 135 N. W. 1129, a hotel caught fire in a frame addition built thereto. One hose was attached to a plug and used in the main entrance to the hotel where there was smoke only, another hose was then attached to another plug and laid across defendant's track to the seat of the fire. The flames were being brought under control when defendant backed a locomotive over the hose and cut it. In replacing the cut section, ten to twenty minutes were lost during which time the fire gained such headway as to practically destroy the hotel. It was held, not only that the defend-

ant was liable, but that, in order to recover, the plaintiff did not have to plead and prove wanton negligence, or to prove that the engineer actually knew the hose was on the track, but if he knew there was a fire near the track and knew that the situation and conditions were such as to make it reasonable to anticipate that his engine might interfere with the work of extinguishing the fire, and after such knowledge failed to exercise ordinary care under the circumstances to avoid cutting the hose, defendant was liable.

In Phenix Ins. Co. v. New York Central Ry., 122 App. Div. 113, 106 N. Y. Sup. 696, the court "refused to disturb a verdict against a railway company, although it was a disputed question whether the engineer and fireman of a train were informed of the progress of the fire before arriving at the point where it was raging, it appearing that, as they approached the point where lines of fire hose were laid across the track, they failed to observe signals given them to stop the train, but ran over and cut the hose, and in consequence thereof, the operations of the firemen were delayed so that the fire which was then under control became unmanageable and extended to and destroyed property which otherwise would have been saved." [20 L. R. A. (N. S.) 1110, note.]

In Cleveland, etc. Ry. v. Tauer, 96 N. E. 758, an Indiana case, a train, by blocking a crossing, delayed, for ten minutes, firemen in getting to a burning greenhouse, and it was held that such blocking after being notified to remove the obstruction, was negligence and that defendant was liable for whatever loss occurred which would not have been sustained had the firemen not been delayed. In Clark v. Grand Trunk Ry., 149 Mich. 400, 408, it was announced that if the persons in charge of a freight train had notice and warning of the presence of the hose on the track and could have stopped the train, but instead of doing so, carelessly ran over and cut the hose, thereby causing such delay

that the destruction of plaintiff's property was the direct and necessary result of such carelessness, plaintiff could recover such damages as were consequent upon such delay. To the same effect also are Kiernan v. Metropolitan Con. Co., 170 Mass. 378; Hyde park v. Gay, 120 Mass. 589; Houren v. C. M. & St. P. Ry. Co., 236 Ill. 620.

These cases also hold that the damage is not too remote from the interference to preclude recovery and that, if the interference caused the delay and the fire could have been controlled but for the interference, then such interference is to be regarded as an intervening and concurrent cause of the burning of the building, and in law would, with the fire, form the proximate cause and render defendant liable. They also hold that while it is not possible to prove absolutely what the result of the firemen's efforts would have been, had the progress of the men not been delayed, still, when there is evidence showing that the fire would have been controlled but for the interference and delay, this is a question for the jury. [Houren v. C. M. & St. P. Ry., 236 Ill. 620, l. c. 627; Kiernan v. Metropolitan Co., 170 Mass. 378.] In Valentine v. Minneapolis Ry., 118 N. W. l. c. 974, it is said, "Even though the plaintiff's chance to save his timber was, as alleged by defendant's counsel, merely 'a gambler's chance,' he has a right to take it, and the defendant has no right to destroy such chance and render certain the destruction of his timber." And, "Where a certain result is alleged to be a necessary sequence of the operation of natural laws, a correct judgment must usually depend upon an exact knowledge of so many determining factors that such determination must generally be for the jury."

It would seem from the foregoing that if, after notice of the situation and its exigencies, defendant either carelessly or wilfully interferes with the efforts of those engaged in extinguishing the fire, it will be held

liable for the loss occurring as a direct result of such interference.

This brings us to the facts in the case, which as usual are disputed.

As hereinbefore stated, the plaintiff claims, and the evidence tends to show, that the engineer was informed of the fire and of the hose across the track in time to have stopped the train in a place of safety. According to the engineer's admission he saw evidences of a fire when he passed the Cozart Hotel more than a quarter of a mile before reaching the fire; and he actually saw the fire and knew where it was, and its proximity to the track, as he left the curve and entered the straight piece of track, which point was, at least, more than 700 feet north of the fire.

In plaintiff's behalf it was shown that a man on the track, not up in the engineer's cab, before reaching this point could see the whole north side of the elevator 1145 feet away, and the fire was some eighty or one hundred feet further on. The train, however, held on its way, and as it came on down, Ed. Barnhart, Jr., stood at the edge of the track on the side next to the engineer and signalled and hallooed at him to stop. This was at the Kyle building 653 feet or more north of the elevator. According to this witness the headlight shown in his face, the engineer said something which the witness could not understand, but the train continued on its way going about four miles per hour. Another witness, Massie, who had heard some one say, "Flag that train," and who ran up the track for that purpose, met the train at Swift's poultry house 352 feet north of the elevator, and after signalling and yelling to the engineer to stop and getting no response, jumped on the engine as it passed and said to the engineer, "Stop the train! They have got a hose on the side of the track there." According to Massie, the engineer replied, "We have got to go through here. To hell with the hose! Let them get it

out of the way. We've got to go through, we've got some cars with explosives.'' The train did not stop; but when the defendant's station agent down near the fire gave the regulation railroad stop signal with his lantern, the engineer stopped. According to plaintiff's evidence the point where the engine stopped was far enough away from the fire to permit the train to remain in safety. That evidence also tended to show that the engineer did not remain there but went on down closer to the fire and hose, and by threats and preparations to run over and cut the hose, if it were not removed, compelled its removal. The engineer and train men deny that any signal or warning was given them except the signal by the agent with his lantern. And they claim the train was, on that signal, stopped as soon as possible and within one hundred feet after getting the signal, but that when the train stopped it was so close as to be in danger from the fire, and that in attempting to back, the engine was forced on down close to the hose; and that when the fire chief learned the train could not back, and of the dynamite on board and the consequent danger to the town, that officer in the exercise of his own judgment, ordered the hose removed.

If there is substantial evidence to support plaintiff's contention, then the character of the act causing the delay, the existence or nonexistence of notice and warning, the question of proximate cause, the amount of delay and whether damages resulted therefrom, are all questions for the jury. The weight of the evidence and the credibility of the witnesses are for the jury. [Hurst v. Scammon, 63 Mo. App. 634.] This is a well-recognized rule. And when there is conflicting evidence substantial in character to support both sides of a disputed issue, the verdict of a jury, receiving the approval of the trial judge, is, and ought to be, conclusive on appeal, unless the evidence supporting the verdict is wholly incredible by reason of being incon-

sistent with well-known natural laws. [Bradford v. Railroad, 136 Mo. App. 705; Pickens v. Railroad, 125 Mo. App. 679.]

In addition to the evidence hereinbefore outlined in support of plaintiff's claim that the engineer wilfully disregarded the warning and request to stop, there is also evidence which, in one view, may characterize the intention the engineer had in coming on down in spite of the warning and also bears on the question as to who really caused the hose to be disconnected. The fire chief testified that the train men told him the hose had to be removed or they would run over it; that one of the trainmen came a second time and said "they were going to go over the hose, or cut the hose, and I told them they better not cut it, and just let it go at that; and they come back again, and kept holloing; and the crowd kept holloing that they were going over the hose; going to cut it; so I went back over to the railroad and told them just to go ahead and cut it if they thought that would do; and this man says, we have got five cars of dynamite on here, and says, we will blow up the town if we don't get through here. I said, 'You didn't have any business coming down here at all.' He says, 'Well, we are in here now; you know we can't back up this grade, and we are going to go through, and going to cut that hose if you don't get it out of the way.' We talked back and forth for a time and finally he invited me to go back and look at the cars of dynamite; I told him I didn't have time to go back and examine to see whether they had any dynamite there, I had the fire to fight. He says, 'Well, we are going over that hose, if you don't get it out of the road; we can't stay here any longer; we've got to get out of here and save this train;' so I walked back then and told one of the boys to cut the hose."

"Q. Did you believe him? A. Yes, sir, I believed him, I certainly did.

"Q. Now, what effect would running the train across the hose have upon it? A. It would cut it all to pieces, ruin it.

"Q. State whether—which would take the most time, to take up that hose and let the train go by, or let them run across it and cut it, and then place it back again? A. It would have taken a great deal longer to put in a new section of hose, after the train had run over it, than it would be to uncouple the hose and let them go through."

Ed Lemon testified the train man told the fire chief, "You cut that hose in two or I will cut it in two."

W. H. Hurley testified he heard Osborne, the station agent, say if the hose weren't removed the train would be run over it, and as he came around the engine, the engineer said, "I am going to cut that hose, you better get it out of the road."

W. S. Steele, a witness for defendant, testified: "I heard the trainman tell Bolinger that he would have to cut that hose, and let him through, or he would have to run over it; that he had four carloads of explosives on there, and if it blew up it would kill everybody in town; and that they had some few words about that; and Bolinger hallooed to cut that hose; me and Mr. Hales Leonard cut the hose and let the train go through."

"Q. You mean, by cutting the hose—disconnected it? A. We disconnected the hose, certainly—uncoupled it, rather; letting the train pass through; and coupled it up again."

There was other testimony to the same effect.

In addition to this evidence, Osborne, defendant's station agent, in giving his version of the way the hose was gotten off the track, testifies to certain facts which would indicate that the hose was moved only when it became apparent that the engineer was preparing to run over it. He testified that he twice requested the

fire chief to disconnect the hose and let the train go
through, and made two trips from the engine to the
fire chief for this purpose and then requested the en-
gineer to back out of danger; that thereupon the en-
gineer tried to back but couldn't; that the egineer
then started to go ahead giving the required two blasts
of his whistle, the signal for that purpose, and that
thereupon the men at the hose signalled him to stop
and disconnected the hose. We think the evidence of
this witness, when read between the lines, shows that
the hose was disconnected only in the last extremity
when it became certain the engineer would in a mo-
ment run over it if it was not removed. Now of course
the fact that there was sufficient dynamite on the train
to blow up the town would render it imperatively nec-
essary for the engineer to get out of there at all haz-
ards. Being unable to back out he must go on and
run over the hose if need be. But the mere existence
of the dynamite would not relieve the defendant of
liability. The question of its liability would depend
on whether the engineer was innocent or culpable in
getting into such dangerous situation where it was
necessary for him to get out regardless of results. If
he, knowing all the facts, chose to go down into such
dangerous proximity to the fire as to render it imper-
ative for him to go on through, without regard to what
would be the results to the hose and the fire, and did
go down in such manner as to warrant a reasonable
conclusion that he went intending to either compel the
hose to be removed or run over it, then defendant is
liable. And under these circumstances such liability
cannot be escaped on the claim that the fire chief let
him through on his own judgment and not by coercion.
The evidence is sufficient to support the finding that
the engineer was notified, warned and requested to
stop at a time when the train could have stopped in a
place of safety. If with such notice, the engineer ran
the train either wilfully or negligently, into a place of

danger, which made it necessary to either cut or remove the hose, the defendant is still liable. Nor is this liability affected by the fact that the engineer, after getting so close to the fire as to be in danger, was unable to back. He knew his train was 1540 feet long. He was acquainted with the grade of the road and of the curve at the place. He also knew of the dynamite on board. So that he knew, when he first saw the fire, that if there was danger down there he could not get out by backing but only by going on.

Did the enforced disconnecting of the hose cause any loss greater than would have occurred anyway?

According to the testimony, some six or ten minutes were lost in uncoupling the hose, letting the train through, and coupling up and turning the water on again. At the time the hose was laid the fire was in the east part of the south shed room and corn-crib. The plaintiff the Fire Chief Bolinger, Ex-mayor Barnhart, Jesse Cashman, a fireman, Docherty and Ed Lemon testified that the fire was dying out and was being subdued at the time the hose was disconnected, but that by the time it was again connected the fire had gotten beyond control and had extended to the elevator proper. One of defendant's witnesses testified that if the hose had not been disconnected they could not have saved all of the building but would have saved a part of it. Other witnesses testified that they could have saved the west part of the building and all of the north part and its contents. Ex-mayor Barnhart testified that the elevator would have been saved if the hose had not been interrupted and only the shed or annex would have burned. Cashman, a member of the fire department for four years and who had attended a great many fires, gave the conditions both before and after the interruption, and testified that at the time the hose was disconnected the fire was being "put out right along" and it would have been put out if the hose had not been shut off.

But, as said before, this is a question for the jury to settle. And we have reviewed plaintiff's evidence on that question simply for the purpose of showing the substantial character of that evidence.

We have carefully gone through the entire record and the various briefs submitted and are of the opinion that we are not warranted in disturbing the verdict. Therefore judgment affirmed.

All concur.