COTTONWOOD FIBRE COMPANY, a Corporation, and PETROLEUM HEAT AND POWER COMPANY, a Corporation, Appellants, v. GUY A. THOMPSON, Trustee and Receiver for MISSOURI PACIFIC RAILROAD COMPANY, and MISSOURI PACIFIC RAILROAD COMPANY, a Corporation, Respondents, No. 41236—225 S. W. (2d) 702.

Division One, December 12, 1949.

Motion for Rehearing or to Transfer to Banc Overruled, January 9, 1950.

*Sievers & Reagan, A. K. Schwartz* and *J. Porter Henry* for appellants.

*Thomas J. Cole, Oliver L. Salter* and *Leon P. Embry* for respondents.

 CONKLING, J.—Plaintiffs, Cottonwood Fibre Company and Petroleum Heat and Power Company, tenant in and owner respectively of a factory building, have appealed from an adverse judgment in their action to recover alleged combined actual damages of $102,713.93, and punitive damages of $50,000. Their petition alleged that on the morning of April 10, 1947 the defendant trustee's employees negligently operated a southbound freight train across the Fillmore Street crossing in St. Louis, Missouri, and thereby prevented city fire apparatus from expeditiously and promptly reaching plaintiffs' factory (then afire) and that because of such delay the building and contents were greatly damaged by fire.

The trial court submitted the case to the jury upon the theory of defendants' negligence in blocking the city's fire trucks from the fire, and also submitted the question of punitive damages. The jury's verdict was for the defendants. Plaintiffs assign as error the admission of certain evidence, the giving of an instruction for defendants, and portions of the argument of defendants' counsel to the jury. But in the view we take of the case we deem it unnecessary to discuss the assignments made by plaintiffs because, for reasons we hereinafter state, we rule that no case was made for the jury and the defendants' motion for a directed verdict should have been sustained.

Plaintiffs' factory was about 300 feet west of the Mississippi River, abutted on the north side of Fillmore Street and was immediately east of defendants' north and south double tracks. Fillmore, a public street, running substantially west from the river intersected the railroad tracks and Broadway (extending north and south) at a right angle. Broadway was about a half block west of the railroad tracks. Elwood Street, lying parallel with and not quite 300 feet north of Fillmore, likewise ran west from the river and intersected the railroad tracks and Broadway at a right angle. Plaintiffs' factory could be reached by the fire department only by approaching from the west over Fillmore or Elwood. There was no north and south street between plaintiffs' factory and the river. On the west side of (and as a part of) plaintiffs' factory there was a loading platform, abutting a switch track which lay east of the two main line railroad tracks. There was a fire-alarm hook on a telephone pole on the north side of Fillmore and just west of the railroad tracks. A fire hydrant was located east of the track on the north side of Fillmore and near the

factory. The building was two stories high; in the factory Cottonwood Fibre Company processed waste rope, jute and sisal, some of which was oil soaked and greasy, and was highly inflammable and combustible. The building had wooden floors and roof.

There was a 55 gallon barrel of water with buckets near where the fire started on the second floor. On that floor there were fire extinguishers; and also a sprinkler system substantially directly above where the fire started, but which failed to work. There were also water faucets but no hose. An employee was sweeping loose jute and sweeping dust "off the framework". The dust burned very rapidly. The fire started on the floor in the loose jute and dust, a little north of the center of the building and about two feet away from some machinery. There was some loose material 8 or 10 feet away. "It was a fast fire, flash fire I would say * * * it was just like you throwed a can of gasoline and put a match to it". The company office was on the second floor but when the fire was discovered no one used the office telephone to call the fire department. The fire was fought by the employees but they lost control of the fire in a minute and a half or two minutes and all left the building. The fire was "too great for us to handle". After the employees had fought the fire for "about a minute or so", the foreman sent one Lambert, an employee who had also been fighting the fire, to pull the fire alarm hook on Fillmore Street across the railroad tracks. He did so. Thereafter Lambert saw defendants' train "just approaching Elwood Street" (a block north), so he then stood in the middle of the railroad track "and pointed over and hollered 'fire' ". The freight train was moving 5 to 8 miles an hour but did not stop, so Lambert jumped off the track on the side toward Broadway. He did not see any fire department apparatus "right away". "After I was there awhile I heard them (fire trucks) coming * * * they come on Broadway and turned in on Fillmore".

After the fire was beyond control and it was unsafe to stay longer in the building the foreman "ordered everybody out of the plant", and then went out onto the loading dock. He could not say definitely whether there was any smoke at that time. He then heard a fire department siren, and saw the moving southbound train about 80 feet north from Fillmore and waved, "but they evidently didn't know what I wanted, because I waved to them at times when they go by". He testified: "The fire department arrived on Broadway about the same time as the engine hit the crossing on Fillmore". Both Lambert and Preston, the foreman, estimated it took the train 6 to 8 minutes to move over the crossing. After the train passed over the crossing the fire department ▮▮▮ moved east over the railroad tracks and started to fight the fire. The building and the contents were substantially destroyed by fire.

The Vice-President of Cottonwood Fibre, Mr. Sieving, testified he was in the office when he saw the fire. He ran downstairs, telephoned the president, ran back upstairs, and then ran down the steps out onto Fillmore Street. He then saw the moving train with the engine two car lengths south of Fillmore. He heard the sound of the sirens coming from the direction of Broadway. When he left the building shredded jute and other material and the roof and joists were burning. He estimated the damage at that time was about $500.00.

Defendants' testimony tended to establish that its train of 75 or 80 cars carried two cabooses, one just immediately behind the Diesel engine; that the train, more than half a mile long, moved over Fillmore Street at 15 or 20 miles per hour; that approaching Fillmore Street the engineer and fireman, looking out ahead, saw no smoke nor any sign of anything wrong at all until they had crossed Fillmore; that they saw no one on the track pointing or waving but a man ran across the track as the engine reached Fillmore; that no fire truck was on Fillmore, nor in sight to the west, as the engine crossed Fillmore, but when 15 or 20 car lengths south of Fillmore the engineer heard a siren; that when the train was 25 or 30 car lengths south of Fillmore a fire truck turned north onto Broadway from a street a quarter of a mile south of Fillmore; that the switch foreman (riding in the first caboose) looked out for "hot boxes" when the train was 15 or 20 car lengths south of Fillmore, and saw what "looked like an explosion", at Cottonwood Fibre; that the switch foreman then told the engineer and fireman about it and told them to speed up; the engineer then increased the speed; and that the train cleared the crossing in a total time of about a minute and a half.

Substantially, the only difference in the testimony of plaintiffs and of the defendants is that the plaintiffs' testimony places the speed of the train at 5 to 8 miles per hour, while the defendants' testimony places the speed of the train at 15 to 20 miles an hour; and the plaintiffs' testimony was that the train consumed 6 to 8 minutes to cross the crossing, while the testimony of defendants was that the train used about a minute and a half to cross the crossing. The train was 75 or 80 cars in length, with an average length of 38 to 45 feet, making the total length of the train about 3177 feet. Mathematically computed upon plaintiffs' figures, the train consumed 5 minutes and 53 seconds to cross the Fillmore Street crossing. Mathematically computed on defendants' figures as to speed, the train took 2 minutes and 2 seconds to cross that crossing.

No contention is here made that the railroad started this fire or that the railroad was in any wise responsible for its origin. Nor do the instant facts bring this case within the rule of such cases as Hurley v. M. K. & T. R. Co., 170 Mo. App. 235, 156 S. W. 57, Little Rock Traction & Elec. Co. v. McCaskill, 75 Ark. 133, 86 S. W. 997, Erickson v. Great Northern Ry. Co., 117 Minn. 348, 135 N. W. 1129,

39 L. R. A. (N. S.) 237, and McAdoo v. Hanway, 109 Atl. (Md.) 446, where, in those cases, a fire was being successfully fought and the railroad ran over or caused the severance of the hose line in actual use fighting the fire, thus causing the fire to get out of control and the premises to be consumed.

But it is unquestionably true that railroads are under a duty to operate their trains with reasonable regard for the rights of public firemen and private citizens to use public crossings and streets to reach a fire to extinguish it. Under certain circumstances, interference with the rights of the public to fire protection violates a fundamental social duty and is a common law tort. Hurley v. M. K. & T. Ry. Co., supra, Amer. Sheet & Tin Plate Co. v. Pittsburgh & L. E. Ry. Co., 143 Fed. 789, 12 L. R. A. (N. S.) 382, Felter v. Del. & H. R. Corp., 19 Fed. Supp. 852, Delaware & H. R. Corp. v. Felter, 98 Fed. (2d) 868, Globe Malleable Iron & Steel Co. v. N. Y. C. & H. R. R. Co., 227 N. Y. 58, 124 N. E. 109, 5 A. L. R. 1648, Luedeke v. C. & N. W. R. Co., (Neb.) 231 N. W. 695, 71 A. L. R. 912. See also annotations, 5 A. L. R. 1651, 71 A. L. R. 917, and 51 C. J. 1139.

But the duty of the railroad (just above referred to) does not arise unless it is proved that those operating the train had knowledge of the fire and knew that by operating the train over the crossing the work of extinguishing the fire would be impeded. When knowledge of the railroad employees of the fire is established the railroad is then under the duty to avoid, if possible, or to mitigate its interference with the control of the fire. •If any liability is to be imposed it must arise from something done or left undone after those operating the train have knowledge of the existence of the fire. In Northern Assur. Co. v. N. Y. C. R. Co., (Mich.) 260 N. W. 763, it was said, ''* * * knowledge must be brought home to those in charge of the operation of its trains that there is a fire near the railroad company's right of way, and that by running its train past it * * * it will interfere with the work of extinguishing it, or increase the public or private danger to result therefrom. It must be shown that those in charge of and conducting the train knew, or ought to have known, what the situation was, * * * in order to make the otherwise regular operation of defendant's train an unlawful interference with and invasion of plaintiffs' rights''. See also, Felter v. Del. & H. R. Corp., supra, Clark v. Grand Trunk R. Co., 149 Mich. 400, 112 N. W. 1121, Hartford Fire Ins. Co. v. Mellon, (Iowa) 220 N. W. 331, Kirstein v. Philadelphia & R. Ry. Co., 257 Pa. 192, 101 Atl. 338, 5 A. L. R. 1646.

██ It is said in plaintiffs' brief that ''Lambert stood in the middle of the track on which this train was located and hollered 'fire' and pointed to the building of appellants and to the smoke coming out of the building and waved his arms in an attempt to flag the train to a stop''. But this was not even constructive notice to de-

fendant of the fire. Neither the engineer or fireman knew of the fire, nor did they see any one waving or pointing or hollering but did see a man run over the track as the engine was about to go over Fillmore Street. In Northern Assur. Co. v. N. Y. C. R. Co., supra, a hose laid across the railroad track was severed by a train, and when 914 feet west of the crossing near which the fire occurred the engineer saw a man waving and knew something was wrong but assumed from the signal that there was some difficulty at the crossing. The engineer made only a service application of the brakes to bring the train more nearly under control, instead of making an emergency stop. In discussing whether the signal (which the engineer in that case saw) was notice of the existence of the fire, the court there said: ''Railroad trainmen are frequently signalled, and the usual signals used either in the nighttime or in the daytime in the control and operation of trains are well understood by railroad trainmen. · The operators of trains running on schedules ought not to heed every one who makes a motion, or attempts to communicate with the operatives of the train by signal or otherwise. · If such signals are not those in usual and ordinary use, if they convey no message to those operating the train, then they are not notice to the trainmen of anything''. And upon that point the facts of the instant case are much weaker than in the just quoted case.

 In the instant case those in charge of this engine, had no knowledge or information whatever of the fire in plaintiffs' factory until, when the train was 15 or 20 car lengths, or more, south of Fillmore the switch foreman communicated such information to them. Until that time there was no duty on the trainmen to do anything. The speed of the train was then increased. No one could then have done more. More than a fourth of the train was then across Fillmore. The jury quite obviously took the view that the trainmen did the best thing under the existing circumstances when they pulled the train on across the Fillmore Street crossing, rather than try to stop and cut the train at the crossing. The course they pursued surely cleared the crossing more quickly. There is nothing before us here to indicate that going ahead was not the most expeditious way to clear the crossing.

In Kirstein v. Philadelphia & R. R. Co., supra, fire engines, responding to a call, reached a railroad crossing but could not cross because the crossing gates were then down and closed; two long freight trains were approaching the crossing from opposite directions and the nearest train was 400 feet away; those in charge of the trains, as they passed the crossing, saw the fire engines waiting for the gates to be raised; it took 10 to 13 minutes for both trains to clear the crossing. In discussing whether those facts gave defendant's employees notice of the existence of the fire, a half block from the crossing, the court said: ''We see nothing in the evidence indicating even

in remote way that any of defendant's employees knew of the existence of this particular fire. * * * In what we have said we include as well the gatemen or flagman''.

For reasons above noted plaintiffs failed to make a case for the jury. And another equally cogent reason is plainly apparent. Plaintiffs' action is grounded upon negligence and unless there is proof in the record before us that such alleged negligence was the proximate cause of plaintiffs' alleged loss and damage no recovery could be permitted in any event. In this record we find neither proof of proximate cause nor any facts from which the jury could reasonably infer proximate cause. Assuming a proper evidentiary basis (which we above rule does not here exist), the ultimate question the jury would have to determine would be whether the fire could have been extinguished by the city fire department had defendants' train not impeded the fire trucks.

Many links in the chain of proximate causation are here obscured in doubt. Upon this record at most there could have been a delay of no more than six minutes and when the firemen crossed the railroad tracks and reached the factory the fire was wholly beyond control. At what minute must the firemen have been there to save the property? Who could say from these facts (there is no proof) how many, if any, and what minutes caused the loss incurred? Only with speculation and conjecture could those questions be answered. Under the facts here, there is no proof and no allowable inference that if there had been no impediment to the fire trucks crossing the tracks, that all the necessary agencies and requirements of the situation would have efficiently and harmoniously cooperated, and with such fineness of timing and promptness as to have extinguished the conflagration without further loss. Years of experience has demonstrated that fire fighting is speculative and uncertain as to results. No two fires are alike. Proximate causation here is but speculation. Many things must be here assumed as to which there is no evidence and inference must be piled upon inference to hold defendants liable. This fire of this highly combustible material and wooden building was wholly beyond control in two minutes after its discovery, and the employees were forced to leave the building long before the fire department was within many blocks of the railroad crossing. Under these circumstances the extent to which it may have spread before the firemen could have started to fight it (assuming there had been no train) is purest conjecture; and whether the firemen could even then have reduced the loss at all, under the existing circumstances, is but guesswork. This record affords us no proof and no basis for inference.

It does not follow from the fact that at the time Sieving last left the second floor he concluded the damage was only $500, that if there had been no train the fire department could either have controlled or extinguished the fire, or held the damage to $500, or could have

1070

minimized the loss at all. Sieving testified he was no nearer than 70 feet to the fire at any time, and that, in any event, he could not see from where he was the extent of the fire.

From a close study of the transcript, and in view of the applicable principles, we are constrained to rule that plaintiffs' evidence made no case which the court could submit to the jury. And the question of whether any blocking of the Fillmore Street crossing by the train was the proximate cause of any loss is but speculative and conjectural. Reaching this conclusion a judgment for plaintiffs could never be allowed to stand in any event. Sparks v. Auslander, 353 Mo. 177, 182 S. W. (2d) 167, 171, Seago v. N. Y. Cent. R. Co., 349 Mo. 1249, 164 S. W. (2d) 336, 147 A. L. R. 372, Evans v. Massman Construction Co., 343 Mo. 632, 122 S. W. (2d) 924, 932, Markley v. Kansas City Southern R. Co., 338 Mo. 436, 90 S. W. (2d) 409. See also Eclipse Lumber Co. v. Davis, (Iowa) 195 N. W. 337, Lebanon, Louisville & Lexington Tel. Co. v. Lanham Lumber Co., 131 Ky. 718, 115 S. W. 824 and Volquardsen v. Iowa Telephone Co., 148 Iowa, 77, 126 N. W. 928, 28 L. R. A. (N. S.) 554, Boutte v. Morgan's L. & T. R. & S. S. Co., 103 Sou. (La.) 158.

 Claimed errors assigned on plaintiffs' appeal after verdict and judgment for defendant, in any event were harmless where, as here, upon the evidence there is no case for the jury. O'Dell v. Dean, 356 Mo. 861, 204 S. W. (2d) 248, Adams v. Othenin's Estate, (Mo. Sup.) 161 S. W. (2d) 415. The judgment of the court below is affirmed. It is so ordered. All concur.