**KAHN et al. v. SOUTHERN RY. CO.**

No. 6521.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 12, 1953.

Decided March 16, 1953.

Robert R. Williams, Jr., and R. R. Williams, Asheville, N. C., for appellants.

George H. Ward, Asheville, N. C. (W. T. Joyner, Raleigh, N. C., and Harold K. Bennett, Asheville, N. C., on the brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

These are appeals from directed verdicts entered by the District Court at the close of all the evidence in three civil actions consolidated for trial against the Southern Railway Company for damages caused by alleged negligence in blocking a street crossing in Asheville, North Carolina, and thereby delaying the arrival of fire apparatus of the city's Fire Department at a fire in a building owned by Mortimer I. Kahn and leased and occupied by the Kahn Company, Inc. and Broad River Processing Company, Inc. Several fire insurance companies were made additional parties plaintiff in each case on account of subrogation rights arising out of pay-

ments on the fire loss exceeding $75,000.

The tracks of the Southern Railway run parallel to and several hundred feet east of the French Broad River through the City of Asheville from Biltmore on the south to the northern limits of the city, a distance of several miles. Riverside Drive runs north and south between the tracks and the river; and on the east side of this street a number of buildings, including the Kahn building, have been constructed and occupied for business purposes. The most readily accessible approach to this business section is Lyman Street, which crosses the tracks of the Southern Railway within its railroad yards, three or four blocks north of the Kahn Building. The nearest street crossing the railroad south of Lyman Street is at Biltmore, a distance of three miles, and the nearest street crossing the railroad north of Lyman Street is at the old Smith Bridge, a distance of nearly a mile.

The major part of the area bounded by Lyman Street on the north, Riverside Drive on the west, and the main line of the Southern Railway on the east is used for railroad purposes. Here are located the yards of the railway, where interstate trains are made up, and also its round house, car repair shops, main lines and side tracks.

The Kahn Building is situated on the east side of Riverside Drive about 400 feet west of the main track and about three or four blocks south of Lyman Street crossing. Almost directly across the tracks and to the east of the Kahn Building is situated a Fire Department Station of the city known as the Bartlett Street Station. Leaving this fire station a fire engine bound for the Kahn Building by the shortest route could travel three or four blocks north on Depot Street (which runs parallel to Riverside Drive) to Lyman Street, west on Lyman Street about one block and then three or four blocks south on Riverside Drive.

About 11 a. m. on January 27, 1951, R. B. Taylor was working on the third floor of the Kahn Building. He smelled smoke, found that it was coming from the second floor, and called the owner Kahn, who was in his office on the first floor. Kahn went to the second floor, saw the smoke, and called the fire department. This call was

made from six to eight minutes after dis-covery of the fire.

At about the same time a freight train of the Southern Railway, moving south into the Asheville yards from Knoxville, Ten-nessee, halted just north of Lyman Street crossing in order to receive track instruc-tions. The train consisted of a four-unit Diesel locomotive, 133 cars and a caboose, and was about one and a third miles in length. After standing at Lyman Street for two minutes, it began to proceed slowly over the crossing at from four to six miles per hour, gradually picking up speed.

The first alarm phoned in by Kahn was recorded at the Central Fire Station. The Bartlett Street apparatus was immediately ordered out and promptly proceeded to the fire, but was stopped at the Lyman Street crossing by the train moving into the yards.

The delay was reported by radio to the Central Station and fire apparatus from both Biltmore and West Asheville Stations was ordered out. Biltmore Station is located on the same side of the track as the Kahn Building and is about three miles, and five minutes drive away. West Ashe-ville Station is located across the river from the Kahn Building, about two miles from Lyman Street by the shortest route. When its equipment reached the blocked crossing, it was ordered to go back to the bridge crossing the track, about a mile from Lyman Street, and proceed thence to the burning building. This maneuver cov-ered a distance less than three miles and consumed less than five minutes.

The train was in motion when the first firemen reached the Lyman Street crossing, and according to the plaintiffs' testimony the fire apparatus was delayed twenty min-utes at this point by the passing train. There was no watchman at the crossing which was protected by automatic signals and the evidence shows that the men on the train had no knowledge of the fire while the train was crossing the street.

The theory of the plaintiff's case is that the Railway was negligent in blocking the street by the passage of its lengthy train and preventing the fire apparatus from reaching the site of the fire for a substantial

period of time, during which the fire gained headway and much property was destroyed which would have been saved if access to the fire had not been delayed.

To sustain this theory the plaintiffs offered evidence, which was excluded by the trial judge, to the effect that a few months before the fire the Railway had been noti-fied by business men of the locality that Lyman Street had been blocked by it for a substantial period of time on the occasion of a previous fire and that the obstruction of the street by passing trains involved danger of increased loss in case of fire, as well as danger of loss or injury in case of other emergencies.

In addition the plaintiffs offered in evi-dence the opinion of Mortimer I. Kahn, the owner of the building, that if the Bartlett Street fire company had arrived at the fire within a minute or two after it left its fire house the damage would have been negli-gible. This evidence was excluded, seem-ingly on the ground that the witness was not qualified as an expert to express an opinion on the subject. Certain experi-enced firemen, however, were allowed to testify that in their opinion the fire, which originated in bales of rags stowed in the building, must have been burning for sev-eral hours before it was discovered, and that the delay in reaching the building caused by the train did not materially add to the fire loss. The attention of the wit-nesses does not seem to have been called to the fact that the delay caused by the train would not have exceeded three to four minutes if the Bartlett Street firemen had gone back and crossed the tracks on the Smith Bridge as soon as they found that the Lyman Street crossing was blocked.

Two ordinances of the City of Asheville were received in evidence which related to the obstruction of streets by steam rail-roads, and to the rate of speed of trains within the city limits. They are as follows:

"Ordinance No. 537.

"*Blocking Street Crossing.* Any corporation, conductor, engineer, or other employee of any steam railroad company having tracks running across the public streets of this city, who shall obstruct the same, or prevent the free

passage of vehicles and pedestrians longer than three minutes at one time, shall be subject to a penalty of Fifty Dollars for each and every offense."

"Ordinance No. 533.

*"Rate of Speed for Steam Railroads.* No steam railroad company shall run or operate its engines or trains, along, through, or across any street in the City of Asheville at a greater rate of speed than four miles per hour, or at any other place within the City of Asheville at a greater rate of speed than six miles per hour; and any such railroad company violating any of the provisions of this section shall be subject to a penalty of Twenty-Five Dollars for each and every such offense."

The plaintiffs also offered in evidence rules of the Southern Railway system which proscribed the blocking of street crossings for more than five minutes, and directed its trainmen to observe ordinances of cities and towns limiting the obstruction of streets and the rate of speed of trains.

The plaintiffs contend on this appeal (1) that the court erred in rejecting the evidence of the owner of the building and in admitting the evidence of the firemen above referred to; (2) that the Railway Company violated ordinances of the City of Asheville with reference to the obstruction of streets, and that under North Carolina decisions,[1] this violation constitutes negligence per se; (3) that even without reference to the ordinances, the blocking of a public street under the circumstances described amounted to negligence; and (4) that the Railway's negligence was the proximate cause of a great part of the fire loss and that the jury should have been allowed to estimate the amount thereof.

▆ We do not stop to consider the questions of evidence raised by the appellants for the reason that even if their contentions in these respects are sustained, we find no substantial evidence of actionable negligence on the part of the Railway Company. There was evidence that the train was operated in crossing Lyman Street at a greater speed than four miles per hour, the limit fixed by Ordinance No. 533, but the plaintiffs were obviously not injured thereby. The greater speed served only to clear more quickly the obstruction of the street.

▆ It is also true that the passing train obstructed the street longer than the period of three minutes prescribed by Ordinance No. 537; but we think that this provision must be interpreted as applying to trains standing still in the body of the street and not to trains moving on the railroad's right of way. Manifestly, the ordinances must be construed together so as to give each an appropriate place in a reasonable and lawful plan to regulate the traffic both in the interest of the general public, which the railroad serves, as well as in the interest of the local community. If this is not done, and Ordinance No. 537 is held to apply to trains in motion, the result will be to limit unreasonably the length of interstate trains entering the railroad yards in Asheville. In this instance the train was 6900 feet or one and a third miles in length. Going at the rate of four miles per hour it would take such a train 19–2/3 minutes to pass a given point so that in order to comply with the literal interpretation of the ordinances, the train would have to be broken into six sections before entering the railroad yard. In other words, the ordinance, as so interpreted, limits the length of trains passing through Asheville to 21 cars of the average length of 50 feet. It is not reasonable to suppose that this drastic result was intended. In this connection see the decisions in City of Cincinnati v. Luckey, 85 Ohio App. 463, 87 N.E. 894, 153 Ohio St. 247, 91 N.E.2d 477, where a similar question was considered and a similar result was reached.

▆ If, on the other hand, Ordinance No. 537 was intended to apply to moving trains then, in our opinion, the ordinance must be held to be invalid as contravening the commerce clause of the Federal Con-

1. Paul v. Atlantic Coast Line R. Co., 170 N.C. 230, 87 S.E. 66, L.R.A.1916B, 1079; Hendrix v. Southern Railroad Co., 198 N.C. 142, 150 S.E. 873; Dickey v. Atlantic Coast Line Railroad Co., 196 N. C. 726, 147 S.E. 15.

stitution. The Supreme Court of the United States in Southern Pacific Co. v. Arizona, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915, came to the same conclusion with reference to the Arizona train limit law which made it unlawful to operate within the state a passenger train of more than 14 cars or a freight train of more than 70 cars. The court held that in the absence of conflicting legislation by Congress there is a residuum of power in the states to make laws governing matters of local concern which may, nevertheless, to some degree affect or regulate interstate commerce;[2] but the states have no authority to impede substantially the free flow of commerce from state to state or to regulate those phases of national commerce which, because of the need of uniformity, demand that their regulation, if any, be prescribed by a single authority. The evidence in that case showed that the operation of longer trains than those provided by statute was not only standard practice over the main lines of roads in the United States, but was indispensable to the operation of an efficient and economical railroad system; and that the increased danger from the operation of long trains was more than offset by the dangers attendant to the operation of a larger number of shorter trains. Hence the court held the act invalid, pointing out that many bills limiting train lengths in various ways were pending in state legislatures and that the difficulties of interstate operation would be greatly increased and uniformity would be destroyed under an uncontrolled system of state regulation.

This decision was based in part upon voluminous evidence as to the injurious effect of the statute upon interstate traffic and the relative dangers attendant upon the operation of long and short trains. Specific evidence of this kind is lacking in the pending case but it is nevertheless obvious that the regulation of the length of trains under a literal interpretation of the ordinances would result in an unconstitutional interference with the national commerce. No additional evidence is needed to show that the ordinances so construed come within the condemnation of the following passage from Southern Pacific Co. v. Arizona, 325 U.S. 761, at page 775, 65 S.Ct. 1515, at page 1523:

"If one state may regulate train lengths, so may all the others, and they need not prescribe the same maximum limitation. The practical effect of such regulation is to control train operations beyond the boundaries of the state exacting it because of the necessity of breaking up and reassembling long trains at the nearest terminal points before entering and after leaving the regulating state. The serious impediment to the free flow of commerce by the local regulation of train lengths and the practical necessity that such regulation, if any, must be prescribed by a single body having a nation-wide authority are apparent."

Hence we conclude that the plaintiffs may not recover in this case on the ground that the Railway violated the city ordinances. It is, however, also contended that even if the ordinances are disregarded, the evidence shows that the Railway Company was guilty of negligence which contributed to the plaintiff's loss. The location of the river and the parallel railroad tracks created, it is said, an unusual hazardous condition in case of a fire or other emergency which affected the business houses lying between the river

2. Instances of the lawful regulation of railroads engaged in interstate commerce by statute or by city ordinance may be found in the decisions of the federal courts. Thus a state law prohibiting Sunday traffic was upheld in Hennington v. State of Georgia, 163 U.S. 299, 16 S.Ct. 1086, 41 L.Ed. 166; an ordinance relating to speed of trains within the city limits in Erb v. Morasch, 177 U.S. 584, 20 S.Ct. 819, 44 L.Ed. 897; an ordinance directing the removal of side tracks in Denver & R. G. R. Co. v. City and County of Denver, 250 U.S. 241, 39 S.Ct. 450, 63 L.Ed. 958; a statute requiring transportation agents to measure up to certain standards and to obtain a local license in State of California v. Thompson, 313 U.S. 109, 61 S.Ct. 930, 85 L.Ed. 1219; and a statute restricting the speed of trains and the period during which a train might remain in a certain area in Atlantic Coast Line v. City of Goldsboro, 232 U.S. 548, 34 S.Ct. 364, 58 L.Ed. 721.

and the tracks when Lyman Street was blocked; and that therefore it became the duty of the Railway Company, when it availed itself of the benefit of long trains, made possible by the modern Diesel locomotive, to take care not to interfere unreasonably with the rights of the people to use the city streets.

Undoubtedly the blocking of a street by a train carelessly left standing at the crossing may subject a railroad company to the payment of damages caused by its neglect because the railroads are under a duty to operate their trains with reasonable regard for the rights of the public; and it has been so held under the circumstances described in Edwards v. Carolina & N. W. Railroad Co., 140 N.C. 49, 52 S. E. 234; Paul v. Atlantic Coast Line Railway Co., 170 N.C. 230, 87 S.E. 66, L.R.A. 1916B, 1079; Houren v. Chicago, M. & St. P. R. Co., 236 Ill. 620, 86 N.E. 611, 20 L.R. A.,N.S., 1110; Cleveland C., C. & St. L. R. Co. v. Tauer, 176 Ind. 621, 96 N.E. 758, 39 L.R.A.,N.S., 20.

But we do not think that it is the duty of those in charge of a train moving lawfully on its right of way to anticipate emergencies which may possibly occur during the relatively brief period of its passage across an intersecting street. If the trainmen know, or have reason to know, as the train approaches or moves across a street, that a fire or other emergency is threatening or destroying nearby property, to which access will be hindered by the obstruction of the crossing by the train, it is unquestionably their duty to do whatever is possible to remove the obstruction and to mitigate interference with the fire authority; but until such knowledge or notice is brought home to them the duty does not arise. In the joint use of the streets by the railroads and the general public, there exists an inevitable risk which is apparent to those who set up their establishments in places accessible only by crossing the tracks; and it is sometimes a difficult matter for the federal and state authorities to formulate reasonable rules to govern and protect the interests of all parties concerned. In the absence of such rules the burden of anticipating and providing for occasional and unexpected emergencies has not been thought, in the absence of notice, to rest upon the railroads engaged in the important business of interstate commerce. This conclusion has been reached in other jurisdictions in which the precise question has been given careful consideration. See Kirstein v. Philadelphia & Reading R. Co., 257 Pa. 192, 101 A. 338, 5 A.L.R. 1646; Cottonwood Fibre Co. v. Thompson, 359 Mo. 1062, 225 S.W.2d 702; Felter v. Del. & H. R. Corp., D.C.M. D.Pa., 19 F.Supp. 852, affirmed 3 Cir., 98 F.2d 868.

Affirmed.