**CSX TRANSPORTATION, INC., Plaintiff,**

v.

**CITY OF PLYMOUTH and Jennifer M. Granholm, Attorney General of the State of Michigan, Defendants.**

No. 98–73615.

United States District Court, E.D. Michigan, Southern Division.

April 12, 2000.

George Pappas, Vicki Margolis, Kevin B. Collins, Venable, Baetjer and Howard, LLP, Baltimore, MD, Jack O. Kalmink, Dirk H. Beckwith, Detroit, MI, Cynthia Craig–Johnson, CSX Transportation, Inc., Jacksonville, FL, for plaintiff.

Michael Frezza, Asst. Attorney General, John W. Martin, Detroit, MI, Daniel Saphire, Washington, DC, for defendants.

**OPINION & ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT; DENYING AS MOOT PLAINTIFF'S MOTION TO STRIKE ATTORNEY GENERAL'S JURY DEMAND; AND DENYING PLAINTIFF'S MOTION TO STRIKE THE BRICKEY AFFIDAVIT**

EDMUNDS, District Judge.

This matter comes before the Court on Plaintiff, CSX Transportation, Inc.'s, ("CSXT") motion for summary judgment

and on Defendants City of Plymouth and the Attorney General of the State of Michigan's cross-motions for summary judgment. Also before the Court are Plaintiff's motion to strike the Attorney General's jury demand and to strike the Brickey Affidavit. The Association of American Railroads has filed an amicus curiae memorandum in support of the positions taken by CSXT in its motion.

As discussed below, CSXT challenges a Michigan state statute which limits the amount of time a train can block a grade crossing to five minutes. CSXT argues that the state law is preempted by federal statutes and regulations and that it unduly burdens interstate commerce in violation of the Commerce Clause. The Court finds that the state statute is preempted by the Federal Railroad Safety Act, 49 U.S.C. § 20101, et seq., and the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. § 10101, et seq., and is unconstitutionally violative of the Commerce Clause. U.S. CONST. ART. I § 8, cl. 3. Accordingly, Plaintiff's motion for summary judgment is GRANTED, and Defendants' cross-motions for summary judgment are DENIED. Plaintiff's motion to strike the Brickey Affidavit is DENIED, and its motion to strike the Attorney General's jury demand is DENIED AS MOOT.

## I. Background

Plaintiff, CSX Transportation, Inc. ("CSXT") operates interstate trains throughout Michigan which cross the City of Plymouth's streets. The trains also cross numerous intersections in Wayne County.

A Michigan statute prohibits the railroad from blocking vehicular traffic at an intersection for longer than five minutes at any one time. Mich. Comp. Laws Ann.

§ 462.391 ("state statute" or "statute"). The statute contains two exceptions to the five minute time limit: (a) if the train is continuously moving in the same direction at not less than 10 miles per hour for not longer than seven minutes; or (b) if the railroad can show that the incident occurred as a result of a verifiable accident, mechanical failure, or unsafe condition. Mich. Comp. Laws Ann. § 462.391(1)(a)-(b). A fine of $500 is imposed for a violation. CSXT has been issued numerous citations for having violated the statute.

CSXT filed this lawsuit seeking a declaration that the state statute is unconstitutional as applied. CSXT argues the statute is (1) expressly preempted by the Federal Railway Safety Act ("FRSA"), 49 U.S.C. § 20101, et seq.; (2) preempted by the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. § 10101, et seq., and (3) unduly burdensome of interstate commerce in violation of the Commerce Clause, U.S. CONST. Art. 1, § 8, cl. 3.

The instant lawsuit represents round two in a bout of litigation between CSXT and the City of Plymouth. A few years ago, CSXT brought a similar declaratory action in federal court against the City of Plymouth seeking to invalidate, on similar grounds, a Plymouth city ordinance which imposed a five minute intersection time limit on the railroad similar to the state statute's time limit at issue here.[1]

The case reached the Sixth Circuit in 1996. In *CSX Transportation, Inc. v. City of Plymouth*, 86 F.3d 626 (6 th Cir.1996)(*"Plymouth I"*), the Court of Appeals affirmed Judge LaPlata's grant of summary judgment for CSXT, finding that the city ordinance was preempted by the FRSA. The FRSA contains an express preemption clause which provides:

---

1. The Plymouth City Ordinance provided, "It shall be unlawful for any railroad company, its successors, assigns, or lessees, or for any officer, agent, or employee thereof, to obstruct free passage of any street or sidewalk within the City, by means of any railroad cars, trains, engines or locomotive for a longer period than five (5) minutes at any one time, nor shall successive trains['] movements be permitted to obstruct streets or highways until all vehicular traffic previously delayed has been cleared or a period of five (5) minutes has elapsed since the obstruction." Plymouth, Mich., Statute, chap. 129, § 10.51.

Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety when the law, regulation, or order -

(1) is necessary to eliminate or reduce an essentially local safety hazard;

(2) is not incompatible with a law, regulation, or order of the United States Government; and

(3) does not unreasonably burden interstate commerce.

49 U.S.C. § 20106.

Only the first sentence of the preemption clause was at issue in *Plymouth I*. Under that sentence, the Court of Appeals determined that the city ordinance was preempted because it "related to railroad safety." Although the ordinance did not make express reference to railroad safety, the Sixth Circuit held that "[i]t is on the basis of potential safety aspects of compliance with the ordinance that the challenged ordinance relates to railroad safety ... [I]t appears that compliance with the challenged ordinance would require either shorter or faster trains." *Plymouth I*, 86 F.3d at 629. Because evidence offered in the case demonstrated that requiring either shorter or faster trains would affect accident rates, the ordinance "related to railroad safety" and was thus preempted.

The Court of Appeals did not address the two "savings clauses" which it held apply only to state statutes. The first savings clause applies to state statutes which regulate railroad safety when the

Secretary has not covered the subject matter of the state requirement. The other applies where the state law addresses a local safety hazard, is not in conflict with federal law, and does not unduly burden interstate commerce. 49 U.S.C. § 20106. The savings clauses were not at issue in *Plymouth I*. They are at issue here because this case involves the application of a state statute.

## II. Facts

The material facts are not in dispute. CSXT's brief contains a detailed explanation of the various ways in which its trains block intersections in violation of the state statute. *See* Pl.'s Br. at 5–26. In sum, CSXT describes three scenarios by which it blocks grade crossings[2] in Wayne, and four scenarios by which it blocks grade crossings in Plymouth. The primary reasons for the blocked crossings are due to the trains' length, the trains' speed limit, which is determined by the class of track maintained by CSXT, the performance of two types of federally-mandated air brake tests, and the coupling and uncoupling of cars. *See* Pl.'s Exb. 2, Jenkins Aff. at ¶¶ 20–64.

Since August of 1997, the violations have resulted in 607 citations by Plymouth, amounting to fines of $303,500 and 285 citations by Wayne, amounting to fines of $142,500. Pl.'s Exb. 2, Jenkins Aff. at ¶ 9.[3]

## III. Standard for Summary Judgment

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that

---

**2.** A "grade crossing" is a place "where a railroad intersects another railroad or a roadway on the same level." WEBSTER'S NEW WORLD DICTIONARY 585 (3d ed.1988).

**3.** A bill pending in the Michigan House of Representatives would amend the state stat-

ute to substantially increase the amount of the fines. For example, instead of $500 per violation, the amount of the fine would increase to $5,000 for a third violation in a seven day period and $25,000 for a tenth violation in a seven day period. House Bill No. 4286.

one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Celotex,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. 2505.

The court must believe the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505. The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505.

## IV. Analysis

### A. Federal Preemption

■ The Supremacy Clause of the United States Constitution provides that "the Laws of the United States ... shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST., Art. VI, cl. 2. Thus where a state law conflicts with or frustrates a federal law, the former must yield. *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 663, 113

S.Ct. 1732, 123 L.Ed.2d 387 (1993); *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981).

The United States Supreme Court has explained that the Supremacy Clause preempts state law in three circumstances. *English v. General Elec. Co.,* 496 U.S. 72, 78, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). First, there is express preemption, whereby Congress explicitly defines the extent to which its pronouncements preempt state law. *Id.; Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 95–98, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). In the context of express preemption, congressional intent controls. *English,* 496 U.S. at 79, 110 S.Ct. 2270; *Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 299, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988). Second, absent explicit direction from Congress, state law is preempted where it "regulates conduct in a field that Congress intended the Federal Government to occupy exclusively." *English,* 496 U.S. at 79, 110 S.Ct. 2270. Such intent may be "inferred from a 'scheme of federal regulation ... so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' or where an Act of Congress 'touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.,* (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). Third, under the doctrine of conflict preemption, a state law is preempted "to the extent that it actually conflicts with federal law." *English,* 496 U.S. at 79, 110 S.Ct. 2270. The Supreme Court has determined that state laws are preempted "where it is impossible for a private party to comply with both state and federal requirements, *see, e.g., Florida Lime and Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *English,* 496 U.S. at 79, 110 S.Ct. 2270,

(quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)).

In this case, Congress has spoken. Thus, the analysis concerns whether or not the state statute is preempted by the Federal Railway Safety Act's express preemption provision.

### B. No Presumption of Validity

■ At the outset, the parties dispute whether the Court should start with a presumption that the state law is valid as an exercise of the state's police powers. The United States Supreme Court very recently resolved this dispute. In *United States v. Locke,* — U.S. —, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000), the Court held preempted a series of regulations enacted by the State of Washington in response to the Exxon Valdez oil spill which addressed *inter alia,* tanker operations and design, as well as crew training and qualifications. In *Locke,* the Court made clear that "an 'assumption' of nonpreemption is not triggered when the State regulates in an area where there has been a history of significant federal presence." *Id.* at 1147. *Contrast, Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977)(assumption triggered where "the field which Congress is said to have pre-empted has been traditionally occupied by the States"); *see also Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)(presumption applied in case involving medical negligence which has been historically regulated by the states). The *Locke* Court noted that "Congress has legislated in the [area of maritime commerce] from the earliest days of the Republic, creating an extensive federal statutory and regulatory scheme." *Locke,* — U.S. at —, 120 S.Ct. at 1148.

Important for our purposes here, the Court expressly stated:

> The state laws now in question bear upon national and international maritime commerce, and in this area there is no beginning assumption that concurrent regulation by the State is a valid exercise of its police powers. Rather, we must ask whether the local laws in question are consistent with the federal statutory structure, which has as one of its objectives a uniformity of regulation for maritime commerce.

*Id.*

There can be no doubt that just as Congress has regulated ships and vessels since the beginning of the Republic, it has similarly done so with respect to our Nation's rail system. Both Congress and the courts have traditionally recognized a need to regulate railroad operations at a national level. Enacted in 1887, the Interstate Commerce Act, ch. 104, 24 Stat. 379 (1887), has been described as "among the most pervasive and comprehensive of federal regulatory schemes." *Chicago and N.W. Transp. Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 318, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981). As amended, the Act still governs federal railroad regulation. Congress' power to regulate the railroad industry has been well-recognized. *Pittsburgh & Lake Erie R.R. v. Railway Labor Executives' Ass'n,* 491 U.S. 490, 510, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989); *Houston, E. & W. Tex. Ry. v. United States,* 234 U.S. 342, 350–52, 34 S.Ct. 833, 58 L.Ed. 1341 (1914). The preclusive effect of federal regulation has been repeatedly acknowledged. *City of Chicago v. Atchison, Topeka and Santa Fe Ry. Co.,* 357 U.S. 77, 88–89, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958); *Colorado v. United States,* 271 U.S. 153, 165–66, 46 S.Ct. 452, 70 L.Ed. 878 (1926).

Several Acts of Congress have established a broad network of federal railroad regulations. In 1970, Congress passed the Federal Railway Safety Act, 49 U.S.C. § 20101, *et seq.,* which was designed to promote the national regulation of railroad safety. In 1980, Congress passed the Staggers Rail Act, Pub.L.No. 96–448, 94 Stat. 1895 (1980), in which it took steps to reduce the state's regulatory authority over interstate rail lines. The Swift Rail Development Act, Pub.L. No. 103–440, 108

Stat. 4615,[4] passed in 1994, provided for the development of high-speed rail transportation, and contained provisions designed to improve safety at highway-railway grade crossings. In 1995, Congress enacted the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. § 10101, *et seq.,* in an effort to further decrease state regulatory and economic controls over the railroad industry.

These decisions and Acts of Congress, as well as the numerous federal regulations which pertain to this area, have created "an extensive federal statutory and regulatory scheme." *Locke,* 120 S.Ct. at 1148. Accordingly, in this area, as in *Locke,* where the state statute at issue bears upon an area traditionally regulated by the federal government, "there is no beginning assumption that concurrent regulation by the State is a valid exercise of its police powers." *Id.*

### C. Express Preemption under Federal Railway Safety Act

Congress enacted the Federal Railway Safety Act ("FRSA") in 1970 in order to promote national regulation of railroad safety. *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 661, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). The Act's purpose is to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. Under the Act, the Secretary of Transportation is entrusted with broad powers to "prescribe regulations and issue orders for every area of railroad safety." 49 U.S.C. § 20103. Another goal of the statute is to ensure national uniformity of railroad regulation, as evidenced by the Act's express preemption provision which reads:

> Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad

safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety when the law, regulation, or order -

> (1) is necessary to eliminate or reduce an essentially local safety hazard;

> (2) is not incompatible with a law, regulation, or order of the United States Government; and

> (3) does not unreasonably burden interstate commerce.

49 U.S.C. § 20106.

■ Under this preemption clause, a state regulation related to railroad safety is permissible where the Secretary has not regulated, or where the state regulation is in response to a local, rather than a national, safety concern, so long as the regulation is not in conflict with federal law and does not unduly burden interstate commerce. Both savings clauses are at issue in this case.

■ It should be noted at the outset that the issue here is not whether the Michigan statute implicates railroad safety concerns, as was the issue with respect to the city ordinance in *Plymouth I. See, e.g., CSX Transp., Inc. v. City of Plymouth,* 86 F.3d 626, 629 (6th Cir.1996); *see also, Southern Pac. Transp. Co. v. Public Util. Comm'n of Oregon,* 9 F.3d 807, 812–13 (9th Cir.1993). Rather, the issue is whether the state statute is valid under either of the two savings clauses.

### 1. First Savings Clause

The first issue is whether the state statute falls within the first savings clause of the preemption provision. The question becomes whether the Secretary of Transportation has prescribed a regulation or issued an order "covering the subject matter" of the state statute. In order to

---

**4.** The Swift Rail Development Act of 1994 is codified as amended in scattered sections of

49 U.S.C.A.

answer this question, the Court must determine the "subject matter" of the state law, and determine whether an order or regulation by the Secretary is deemed to "cover" the subject matter of the state requirement.

The United States Supreme Court, in *CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993), provided some guidance for determining whether a federal regulation covers the subject matter of a state requirement under the FRSA. The Court explained:

> [to prevail on the claim that the [federal] regulations have pre-emptive effect, petitioner must establish more than that they 'touch upon' or 'relate to' th[e] subject matter of the state law], *cf. Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383–84, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992)(statute's use of "relating to" confers broad pre-emptive effect), for 'covering' is a more restrictive term which indicates that pre-emption will lie *only if the federal regulations substantially subsume* the subject matter of the relevant state law.

*Id.* at 664, 113 S.Ct. 1732 (emphasis added).

The Court stressed that the term "covering" is "employed within a provision that displays considerable solicitude for state law in that its express pre-emption clause is both prefaced and succeeded by express saving clauses." *Id.* at 665, 113 S.Ct. 1732.

### a. Subject Matter of the State Requirement

The subject matter of the state requirement, "is the safety concerns that the state law addresses." *Burlington N. and Santa Fe Ry. Co. v. Doyle*, 186 F.3d 790 (7th Cir.1999); *Burlington N. R.R. v. Montana*, 880 F.2d 1104, 1106 (9th Cir.1989). Identifying the safety concerns that a state or federal regulation addresses "will necessarily involve some level of generalization that requires backing away somewhat from the specific provisions at issue." *Doyle*, 186 F.3d at 796. If the court does

not generalize, "a state law could be preempted only if there were an identical federal regulation, and ... *Easterwood* teaches us this is not so." *Id.*, (citing *Easterwood*, 507 U.S. at 674, 113 S.Ct. 1732 (wherein the court found preemption through a series of related regulations and overall structure of regulations, although no regulation directly addressed state requirement) and *Montana*, 880 F.2d at 1106 (wherein the court found federal regulation preempted state law requiring trains to have a caboose because both were aimed at the same safety concerns)).

On the other hand, too much generalizing renders the analysis meaningless because all regulations touch upon rail safety or public safety. *Doyle*, 186 F.3d at 796. For example, in *Easterwood*, the Court did not rely upon broad categories such as "railroad safety" but rather focused more specifically on the narrower categories of warning devices at grade crossings and train speed. *Easterwood*, 507 U.S. at 666–73, 113 S.Ct. 1732; *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 515 (5th Cir.1999).

The Michigan statute at issue limits the amount of time a train can block vehicular traffic to five minutes. The state statute reads, in pertinent part:

(1) A railroad shall not permit a train to obstruct vehicular traffic on a public street or highway for longer than 5 minutes at any 1 time, except the obstruction shall not be considered a violation under the following circumstances:

 (a) If the train is continuously moving in the same direction at not less than 10 miles per hour for not longer than 7 minutes.

 (b) If the railroad can show that the incident occurred as a result of a verifiable accident, mechanical failure, or unsafe condition.

(2) A railroad shall not permit successive train movements to obstruct vehicular traffic on a public street or highway until all vehicular traffic previously delayed by such train movements has been cleared.

(4) Each offense under this section shall be a separate violation punishable by a fine of not more than $500.00 unless the railroad is willfully, deliberately, and negligently blocking vehicular traffic and then the fine shall be not more than $1,000.00 and the costs of prosecution.

Mich. Comp. Laws Ann. § 462.391.

According to the State and the City of Plymouth, the subject matter of the state statute involves vehicular safety, or safety on Michigan highways, and has nothing at all to do with railway safety. Rather, Defendants contend, the state law's safety objective is to facilitate the timely movement of emergency vehicles through grade crossings. They contend that the law's subject matter involves highway safety, an area traditionally regulated by the states. This safety goal is not at odds with the safety goals of railroad regulations, they contend, because railroad regulations address railroad safety, not highway safety. Defendants then repeatedly argue that because there is no corresponding federal regulation which addresses the issue of how long a train may block a crossing, the state statute survives under the first savings clause.

At the outset it should be noted that nothing in the record supports Defendants' purported safety justification for the state law. Neither the plain language of the statute, nor its legislative history support this assertion. The plain language of the statute makes clear that the law applies only to railroads and not to any other vehicle or entity which may cause an obstruction at an intersection. The statute is not one of general applicability, such as a criminal law, antitrust law, or environmental law, which would apply to all persons generally, rather it applies only to regulate railroads.

Defendants offer no legislative history in support of the statute's purported safety concerns. Legislative history offered by CSXT suggests that when the bill that eventually became the statute was first introduced, it allowed railroads to block intersections for ten minutes but that the bill was arbitrarily amended on the House side to limit the amount of time to five minutes. (Pl.'s Exb. 38 at 29–44). Defendants come forward with various scenarios which purport to justify the statute's enactment, post hoc. For example, they offer testimony that a fire doubles every twenty seconds, and that after six minutes a cardiac patient's survival rate is dramatically reduced. (Atty. Gen.'s Exb. C, O'Brien Dep. at 17). Defendants fail to explain how the time limitations imposed by the statute, which allows blockage for between five and seven minutes, further its intended safety goals. That is not to say that the statute lacks a rational basis, but only to point out that there is little evidence in the record to support Defendants' argument that the state statute is aimed to ensure highway safety, rather than to directly regulate railroads. Furthermore the statute is codified in that section of the Michigan Compiled Laws that deals with regulations of railroads. It is not codified within the section of laws relating to motor vehicles (256.1–260.End), or the laws relating to highways (220.1–255.End).

CSXT, on the other hand, argues that the subject matter of the state statute should be determined by what the statute *actually regulates*. CSXT looks to what is required of it in terms of compliance with the state law, and concludes, based on *Plymouth I*, that compliance with the state law's time limit requires it to run either shorter or faster trains. Thus, CSXT argues that the statute's subject matter involves the regulation of train speed, train length, and air brake tests.

It is important to note that in the cases which suggest that the subject matter of the state law be determined in terms of its intended safety objective, *cf., Doyle, Montana*, the safety objective of the law is defined in terms of how the state regulation affects the railroad. Thus, in those cases the state statutes at issue were preempted both because they dealt with safety as it affected the cabooses of trains and because the federal regulations cov-

ered the subject matter of the state's caboose law. The Court here must also evaluate the safety objective of the statute in terms of how it affects railroad safety. Thus, in characterizing the subject matter of the state requirement, the Court must not turn a blind eye to the statute's effect on the railroad, as Defendants would urge the Court to do.

Even assuming that the state statute's subject matter is to be characterized as Defendants suggest, that does not end the inquiry. Defendants would have the Court find that the statute's safety goal is to address highway safety. They then contend that none of the federal regulations address those same safety concerns, and that therefore, the savings clause saves the law from preemption. In sum, they argue repeatedly throughout their briefs that the first savings clause saves the statute because *there is no federal regulation which addresses the issue of how long a train may block a crossing,* which they contend is the subject matter of the state requirement. This narrow characterization of the state law oversimplifies the issue.

Under Defendants' formulation, a state law could be preempted only if there were an identical federal regulation that addressed how long a train could block a crossing. Pursuant to the Supreme Court's decision in *CSX Transportation, Inc. v. Easterwood,* 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993), however, it is not necessary for the federal regulation to be identical in order for preemption to apply. *Easterwood* found preemption through a series of related regulations, even though *no particular regulation addressed the state requirement. Id.* at 675, 113 S.Ct. 1732.

Thomas Easterwood died when his truck collided with a train at a grade crossing in Georgia. His surviving wife filed a diversity suit alleging breaches of CSXT's state common law duty to operate a train at a reasonable speed and CSXT's state statutory duty to maintain proper warning signals at the grade crossing. The Supreme Court held that the FRSA preempted the state law concerning train speed, but not the state law concerning maintenance of warning signals. *Id.* at 676, 113 S.Ct. 1732.

The Court focused its analysis upon whether existing federal regulations "covered the subject matter of train speed." *Id.* at 675, 113 S.Ct. 1732. The Court easily identified "train speed" as the subject matter of the state law. The Court found that regulations enacted under FRSA "covered the subject matter." The regulations classified train tracks according to hazards posed by track conditions, and set maximum speed requirements for each track class. The Court was not persuaded by Easterwood's argument that preemption did not lie because "the Secretary's primary purpose in enacting the speed limits was not to ensure safety at grade crossings, but rather to prevent derailments." *Id.* at 675, 113 S.Ct. 1732. Relying on the plain meaning of the preemption clause, the Court found that the clause did not "call for an inquiry into the Secretary's purposes, but instead directs the courts to determine whether regulations ... cover the subject matter of train speed." *Id.* The Court found that the federal speed regulation established a ceiling which "preclud[ed] additional state regulation." [5]

---

**5.** As for the adequacy of crossing signals, the Court held that the state statute was not preempted. CSXT offered two sources of preemption, the Highway Safety Act of 1973 and the Manual on Uniform Control of Traffic Devices. The Highway Act required states employing federal funds to upgrade crossings to conform with federal regulations. The regulations did not preempt state law because they merely "establish the general terms of

the bargain between the federal and state governments: the States may obtain federal funds if they take certain steps to ensure that the funds are efficiently spent." *Id.* at 667, 113 S.Ct. 1732 The regulations "provided no affirmative indication of their effect on negligence law." *Id.* at 668, 113 S.Ct. 1732.

Similarly, the guidelines of the Manual did not preempt state law. The Court found it implausible that state law could be preempted

In determining that train speed was the subject matter of the state law, the Court essentially looked at what the state law regulated, more so than at its purpose. The common law claim was based on a theory of excessive speed, thus the state law purported to regulate the subject matter of speed, a subject which federal regulations amply covered. Similarly here, the state statute's purpose may indeed be directed at highway safety. However, the state statute actually regulates, albeit indirectly, the subject matter of speed, train length, and the performance of air brake tests.

### b. Speed

In 1971, the Secretary of Transportation promulgated regulations setting maximum train speeds for different classes of track. 49 C.F.R. 213.9. As just discussed, in *Easterwood*, the Supreme Court held that the FRSA preempted a state claim for negligence based on excessive speed. The Court recognized that the regulation addresses only maximum speeds at which trains are permitted to travel, but noted that "the speed limits must be read as not only establishing a ceiling, but also precluding additional state regulation...." *Easterwood*, 507 U.S. at 674, 113 S.Ct. 1732. The Court stated that the regulation "should be understood as covering the subject matter of train speed with respect to the track conditions, including the conditions posed by grade crossings." *Id.* at 675, 113 S.Ct. 1732.

There can be little doubt that the state regulation here imposes a condition on grade crossings which is related to the train's speed. Indeed the statute facially regulates train speed by including an exception which exempts a train from a violation "[i]f the train is continuously moving in the same direction at not less than 10 miles per hour for not longer than 7 minutes." Mich. Comp. Laws Ann.

462.391(1)(a). The FRA recently made comprehensive revisions to the Track Safety Standards set forth in 49 C.F.R. Part 213. In so doing, the FRA reiterated the breadth of federal speed regulation and explicitly noted that there is no room for adjustments of train speed at grade crossings:

> Under the current Track Safety Standards, FRA has only an indirect role in determining speed limits. Railroads set train speed in their timetables or train orders. Once a railroad sets a train speed, it must then maintain the track according to FRA standards for the class of track that corresponds to that train speed. The signal and train control regulations also fix limits on train speed based upon the type of signal system that is in place. If the railroad fails to comply with track or signal system requirements for speed at which trains are operated, the railroad is subject to penalty.
>
> **FRA's current regulations governing train speed do not afford any adjustment of train speeds in urban settings or at grade crossings. This omission is intentional. FRA believes that locally established speed limits may result in hundreds of individual speed restrictions along a train's route, increasing safety hazards and causing train delays.**

Pl.'s Exb. 25, 63 Fed.Reg. at 33998–99.

There can be little doubt that to the extent the state statute regulates speed, it is preempted by the FRSA, because the federal regulations cover the subject matter.

Defendants make two primary arguments in response to CSXT's contention that federal speed regulations preempt the statute. First, Defendants argue that the federal train speed regulations are aimed

---

by "an elliptical reference in a Government manual otherwise devoted to describing for the benefit of state employees the proper size, color, and shape of traffic signs and signals." *Id.* at 669, 113 S.Ct. 1732. The Manual itself

stated that "[i]t is the intent that the provisions of the Manual be standards for traffic control devices installation, but not a legal requirement for installation." *Id.*

at a distinctly different safety purpose than the state statute which they dub the "Traffic Obstruction Statute." They contend that 49 C.F.R. § 213.9 is aimed at railroad safety, specifically, hazards imposed by track conditions, i.e. traveling too fast for the track selected by CSXT. In contrast, the Traffic Obstruction Statute is aimed at "minimizing delays of EMS, police and fire vehicles on highways and preserving lives and property distant and unconnected to the railroad." Accordingly, the regulation does not preempt the state law. (Atty Gen's Br. at 19).

The argument has simple appeal. In *Easterwood*, however, the Court specifically rejected Easterwood's attempt to focus on the purpose behind the federal regulation in determining whether federal law covered the subject matter. *Id.* at 675, 113 S.Ct. 1732. The State here cannot ignore the fact that the effect of its regulation is to regulate train speed and length. Numerous cases have held that 49 C.F.R. 213.9 preempts train speed requirements, rejecting the proposition that individual localities can establish local speed requirements. *See City of Covington, Kentucky v. Chesapeake & Ohio Ry. Co.*, 708 F.Supp. 806 (E.D.Ky.1989)(first savings clause would not save local ordinance limiting train speed to twenty-five miles per hour because 49 CFR § 213.9 covers the same subject matter); *Consolidated Rail Corp. v. Smith*, 664 F.Supp. 1228 (N.D.Ind.1987)(finding ordinances regulating local train speed limit preempted, and stating that "separate regulation by every city, village, township, or hamlet along the mainline would undermine safety infinitely more. Separate municipal regulation of speed is so greatly at odds with the Congressional purpose of uniformity as to need no further argument." *Id.* at 1238); *Southern Pac. Transp. Co. v. Baldwin*, 685 F.Supp. 601 (W.D.La.1987)(finding that the first savings clause could not save the local ordinance because the "Secretary of Transportation has enacted regulations specifically designating permissible operating speeds for various classes of track." *Id.* at 603 (citing 49 C.F.R. § 213.9)).

The state law here, in effect, regulates length and speed. The law, in practice, sets a minimum speed limit, which requires the trains to travel faster through intersections with local roads, implicating serious grade crossing safety concerns. The Secretary of Transportation has found that higher average train speeds lead to an increase in the number of fatal accidents. *See* Sec. of Transp. Report to Congress, April 1989; *see also Plymouth I*, 86 F.3d at 630. If CSXT were to run shorter trains, they would have to run more trains per day in order to meet the daily demands of their business. The Secretary has also found that "[c]hanges in highway traffic volumes and total trains per day affect accident rates more than other factors." *Id.* at 629. Thus to the extent that the statute regulates speed, or would require a higher volume of shorter trains, it affects railroad grade crossing safety. *Id.* at 630. The import of this is not to point out that the state statute "relates to" railroad safety, for clearly it does under the holding of *Plymouth I*, but rather to point out that the statute affects safety at grade crossings. Grade crossing safety, in addition to speed, is an area covered by the federal regulations. Part 234 of 49 C.F.R. sets forth a detailed set of regulations detailing grade crossing signal safety and procedures to follow in the event of a grade crossing warning system malfunction. The regulations set forth maximum speed requirements at grade crossings which apply in the event of a signal system failure. 49 C.F.R. § 234.105; 234.106; 234.107.

Second, and more importantly, Defendants argue that federal law does not establish train speed. Rather, the railroads select the speed and then the FRA determines which class of track it must maintain based on that selection. "Once a railroad sets a train speed, it must then maintain the track according to FRA standards for the class of track that corresponds to that train speed." 63 Fed.Reg. 33998–999. *Easterwood* involved a class four track for which the maximum speed was sixty miles

per hour. The train in *Easterwood* was traveling below this federal maximum, but the plaintiff argued that the railroad breached its common law duty to operate its train at a moderate and safe rate of speed.

Thus Defendants attempt to distinguish *Easterwood* on the grounds that CSXT could select a faster speed and upgrade its track class in order to comply with the state statute. Viewed in this way, there are other ways in which CSXT could comply besides running shorter or faster trains. They could upgrade their track class, thus upgrading the federally mandated speed for that type of track. If this is the case, then the state law does not have the effect of limiting length or increasing speed, but rather would have the effect of requiring the railroad to restructure its lines at a considerable expense. To the extent that the state statute has this effect, as discussed below, it is preempted by the Interstate Commerce Commission Termination Act, 49 U.S.C. § 10101, *et seq.*, and violates of the Commerce Clause.

### c. Length

The statute also can be viewed as having the effect of regulating train length. It is important to note that, mathematically, speed and length cannot be separated.[6]

Accordingly, the fact that speed is preempted obviates the need for a discussion of whether length is preempted.

To the extent that a discussion of length is instructive, however, the Court notes that the United States Supreme Court has expressly invalidated, on Commerce Clause grounds, regulation by the states of train length. *Southern Pac. Co. v. Arizona*, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945)(invalidating Arizona's train length limit law under the Commerce Clause, stating that "[t]he serious impediment to the free flow of commerce by the local regulation of train lengths and the practical necessity that such regulation, if any, must be prescribed by a single body having a nation-wide authority are apparent." *Id.* at 775, 65 S.Ct. 1515). At least one federal court of appeals has considered an enactment's burden on commerce in considering a FRSA preemption question. In *Missouri Pac. Ry. v. Railroad Comm'n of Tex.*, 850 F.2d 264, 269 (5th Cir.1988), the court stated: "[w]e point out that we apply the burden on commerce analysis in this case not to make a constitutional decision but to emphasize the need for preemption: that is, we find valid federal preemption in part by emphasizing the burden on commerce created by the state regulations." *Id.* Similarly here, the fact that regulation of length has been held to violate the Commerce Clause is relevant to the preemption analysis.[7]

---

**6.** d = vt. Distance = velocity × time. In this situation, D = the length of the train plus the width of the crossing. T = the time, which is fixed by the statute at 5 minutes. V = the speed of the train. Under this formula, length and speed are directly proportional. If the amount of time is limited to 5 minutes then the speed must increase as the length of the train increases in order for it to make it past the crossing in time. Similarly, if the train is shorter, the speed can be slower.

**7.** CSXT contends also that federal law preempts any attempt by the state to regulate train length based on negative preemption. *See Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 178, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978).

Under *Ray*, negative preemption lies where the failure of federal officials "affirmatively to exercise their full authority takes on the character of a ruling that no such regulation is

appropriate or approved pursuant to the policy of the statute." *Id.* The Sixth Circuit has recognized that negative preemption applies under the FRSA. *Norfolk & W. Ry. v. Public Util. Comm'n of Ohio*, 926 F.2d 567, 570–71 (6th Cir.1991). In *Norfolk & Western* the Court of Appeals held that an Ohio requirement that railroads provide and maintain walkways on its bridges was preempted by the FRSA because the FRA addressed the issue of railroad bridge walkways and decided that a general bridge walkway was not necessary. *See also Burlington N. & Santa Fe Ry. v. Doyle*, 186 F.3d 790, 795–804 (7th Cir. 1999)(FRA decisions and actions addressing one-person crews preempted state statute requiring two person crews); *Burlington N. R.R. v. Montana*, 880 F.2d 1104 (9th Cir. 1989)(state requirement that trains have a caboose was preempted because the FRA addressed the caboose requirement and declined to require cabooses); *Missouri Pac.*

### d. Federal Air Brake Testing

Two federal regulations require the railroad to perform air brake testing. 49 C.F.R. § 232.12 and § 232.13. When a train sits idle for a period of less than two hours, it must perform a ten to twenty minute air brake test involving set up and release. 49 C.F.R. § 232.13. When a train is idle for two hours or more, it must perform a full-blown initial terminal air brake test pursuant to 49 C.F.R. § 232.12. This latter form of testing can take up to forty-five minutes. The performance of these federally mandated air brake tests causes CSXT to block crossings in both Plymouth and Wayne. (CSXT's Br. at 11, 12–13, 19–20, 24).

Defendants' position seems to be that nothing in the federal regulations requires CSXT to conduct the test while blocking a crossing. Defendants' proffered Affidavit of David H. Brickey, which CSXT has moved to strike, indicates that according to his interpretation of federal regulations, "[t]he railroad ... is given discretion to move a train distances up to one mile, so that the tests may be performed where there are no crossings which would be blocked during the testing process." (Atty. Gen.'s Exb. M, Brickey Aff. at ¶ 3). CSXT argues that the affidavit should be stricken because the Attorney General allegedly failed to disclose David Brickey as a witness while discovery was pending. The Attorney General's response reveals that an individual named Steven Brickey was disclosed in error and that it was as a result of a clerical error that the first name was not listed as David. Further, the Court is cognizant of the fact that

Magistrate Judge Carlson allowed CSXT to depose witnesses not listed. Under these circumstances, the Court will not strike the Brickey Affidavit.

 However, considering the affidavit does little to aid Defendants. The interpretation of federal regulations is a matter of law for the court to decide. *Bammerlin v. Navistar Int'l Transp. Corp.*, 30 F.3d 898, 900 (7th Cir.1994)("[t]he meaning of federal regulations is not a question of fact, to be resolved by the jury after a battle of experts. It is a question of law, to be resolved by the court." *Id.*); *see also Harbor Ins. Co. v. Continental Bank*, 922 F.2d 357, 366 (7th Cir.1990); *Specht v. Jensen*, 853 F.2d 805 (10th Cir.1988)(en banc). Nothing in the plain language of the regulations indicates that CSXT has the discretion to move the train before conducting the air brake tests. Further, even assuming that the trains could be moved one mile before the air brake testing takes place, Defendants fail to suggest where CSXT could perform the tests without blocking other intersections.

Alternatively, Defendants assert that if CSXT blocks the intersection in excess of the five minute limitation to perform the federally mandated air brake test, that such a blockage would fall within one of the statute's exceptions. (CSXT Exb. 28, Charles Culver Tr. at 76–77, Exb. 10, Arton Tr. at 83). The state statute contains an exception for blocking which occurs due to an "unsafe condition." Interpreted in this way, the statute has the effect of regulating the performance of the air brake tests because it would require CSXT

---

*R.R. v. Railroad Comm'n*, 850 F.2d 264, 268 (5th Cir.1988)(same).

In each of the cases cited above, negative preemption was found after the federal regulator expressly addressed the same subject matter that the state attempted to regulate. In support of its argument that any state law regulation of train length is negatively preempted, CSXT relies on two sources. The first is a letter to the FRA from the National Transportation Safety Board ("NTSB") dated July 31, 1978 recommending that the FRA limit the length of trains moving hazardous

materials. Pl.'s Exb. 26. It seems a stretch to say that declining to regulate the length of trains carrying hazardous material amounts to the FRA having considered the issue of train length generally.

The second source relied upon by CSXT is a 1986 report in which the FRA decided not to regulate cabooses. 15 Fed.Reg. 17,300. A review of that report reveals that train length was only mentioned in passing. The report cannot be interpreted as having considered and declined to regulate train length generally.

to keep a detailed record of when and where the tests are performed so that it may escape liability under the Act. The federal regulations do not currently require CSXT to keep such a log. To the extent that the statute operates to regulate the performance of federally-mandated air brake testing, it is preempted by the FRSA.

### e. Summary re: First Savings Clause

In sum, the Court finds that federal regulations regarding speed "cover the subject matter" of the state requirement. The state requirement has the effect of actually regulating speed, length, and the performance of air brake testing. The FRA regulations substantially subsume these areas. The federal regulations amply cover the issue of how fast or how slow a train can proceed through a grade crossing, based on the selected class of track. 49 C.F.R. § 213.9, 213.307. The regulations also set maximum train speed limits for different track curvatures and elevations. 49 C.F.R. § 213.57. The federal regulations also limit the class of track which can be laid down at a grade crossing. 49 C.F.R. § 213.347. Federal preemption of speed alone invalidates this statute. As noted, mathematically, speed and length cannot be separated.[8] Thus because the state statute has the effect of regulating speed, and federal regulation of speed covers the subject matter of the state requirement, a separate discussion of whether length is preempted is not necessary. To the extent that a discussion of length may be required, it is important to note that regulation of length carries with it substantial burdens on interstate commerce. *Southern Pacific*, 325 U.S. at 775, 65 S.Ct. 1515; *Missouri Pacific. Ry.*, 850 F.2d at 269. Finally, the state statute has been shown to bear upon the performance of federal air brake testing, an area over which the Secretary has issued explicit regulations. 49 C.F.R. § 232.12–232.13. Accordingly, the state statute cannot survive under the first savings clause.

### 2. Second Savings Clause

Nor is the state statute sheltered from preemption under the second savings clause. That clause provides:

A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety when the law, regulation, or order— (1) is necessary to eliminate or reduce an essentially local safety hazard; (2) is not incompatible with a law, regulation, or order of the United States Government; *and* (3) does not unreasonably burden interstate commerce.

49 U.S.C. § 20106 (emphasis added).

The state statute does not fall within this exception. Where a state law has general, state-wide applicability, it is not considered to eliminate or reduce an essentially local safety hazard. *Norfolk & W. Ry. Co. v. Public Util. Comm'n of Ohio*, 926 F.2d 567, 571–72 (6th Cir.1991)(defendants "never disputed the statewide application of [the challenged] rule. On its face, the rule does not allow for any determinations of a local hazard and is explicitly inconsistent with the definition of a local safety hazard. Because [the rule] has statewide application, it is not within the second exception." *Id.*). *See also, Easterwood*, 507 U.S. at 675, 113 S.Ct. 1732 (noting that the state law negligence rule addresses all hazards caused by lack of due care, "not just those owing to unique local conditions." *Id.*); *Herriman v. Conrail, Inc.*, 883 F.Supp. 303 (N.D.Ind. 1995)(state law is not a local safety hazard where the condition exists at numerous crossings throughout the state); *Landrum v. Norfolk S. Corp.*, 836 F.Supp. 373 (S.D.Miss.1993)(local train speed ordinance applied to all crossings is not a local safety hazard). Because it is not designed to address a local safety hazard, the Court need not consider the other two aspects of this exception. The state statute cannot be saved by the second savings clause.

---

8. *See supra* note 6.

In sum, to the extent that the state statute is viewed as regulating speed, length, and air brake testing, the statute is preempted by the FRSA.

### D. Preemption under the Interstate Commerce Commission Termination Act

██ The Court recognizes the persuasive force of the State's argument that apart from having the effect of regulating speed, length, and air brake testing, that the statute could also be fairly characterized as requiring the railroad to make substantial capital improvements to upgrade its class of track or relocate its yards. Viewed in this way, the law does not affect speed, length, or air brake tests, but rather requires the railroad to undergo substantial renovations at the state's command. *See Norfolk & W. Ry. Co. v. Oregon*, 149 F.3d 1184, 1998 WL 381510 (6th Cir.1998)(unpublished)(distinguishing *Plymouth I* and remanding, noting that an Ohio ordinance which limits the amount of time a train can block a crossing to five minutes may not be preempted under FRSA where there may be a way to comply that does not impact railroad safety). To the extent the state law is viewed as having the effect of requiring the railroad to undergo substantial capital improvements, the Court finds that the law is preempted by the Interstate Commerce Commission Termination Act.

In 1995, Congress enacted the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. § 10101, *et seq.* Congress passed the ICCTA in 1995 in an effort to decrease regulatory controls over the railroad industry. The Act amended certain sections of Title 49 which governs the economic regulation of railroads. The Act, which became effective on January 1, 1996, abolished the Interstate Commerce Commission ("ICC") and created the Surface Transportation Board ("STB") which it vested with exclusive jurisdiction over–

(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classification, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State.

49 U.S.C. § 10501(b).

Several cases have held that this section preempts state law regulation of railroads in an economic sense. For example, in *Soo Line R.R. Co. v. Minneapolis*, 38 F.Supp.2d 1096 (D.Minn.1998), the court held that the ICCTA preempted the city's authority to withhold demolition permits which the railroad sought in order to redevelop a certain rail yard. In so holding, the court reviewed section 10501(b) and noted that "it is difficult to imagine a broader statement of Congress' intent to preempt state regulatory authority over railroad operations." *Soo Line*, 38 F.Supp.2d at 1099. The court noted that "when section 10501(b) grants the STB exclusive jurisdiction over 'transportation by rail carriers,' it logically includes the yard, property, facilities and any intermodal equipment used in connection with a railroad, or related to the movement of passengers or property." *Id.* Similarly, in *Burlington N. Santa Fe Corp. v. Anderson*, 959 F.Supp. 1288 (D.Mont.1997) the court held that the ICCTA preempted a Montana law which required the state to exercise jurisdiction over the "maintenance, closure, consolidation or centralization of railroad shipping facilities, stations and station agencies" within the state. *Id.* at 1291. The court reasoned that the ICCTA expressly preempted state economic regulation of railroad operations:

[S]tate regulation of the closure, consolidation or centralization of agencies has a direct and substantial effect on the field of economic regulation of railroad transportation. Thus, the state regulation at issue falls squarely in the preempted field of economic regulation,

and it affects the policy of deregulation of railroad transportation. The statutory language and accompanying legislative record evidence Congress' clear and manifest intent to occupy the entire field of economic regulation of rail transportation, including the regulation of railroad agencies.

*Id.* at 1296.

Finally, in *City of Auburn v. United States,* 154 F.3d 1025 (9th Cir.1998) the Ninth Circuit affirmed the STB's opinion that the ICCTA preempted a county's ability to review the environmental impact of proposed operations on the formerly inoperable Stampede Pass line. The railroad sought approval to reacquire and operate a portion of the line, which the state attempted to regulate. The Court of Appeals rejected reliance on the Act's legislative history because the Act itself explicitly granted the STB exclusive jurisdiction over the "construction, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located or intended to be located, entirely in one State." 49 U.S.C. § 10501(b). The court rejected the argument that only state economic regulation was preempted because cases interpreting the Act have been applied broadly. *City of Auburn,* 154, F.3d at 1030. The court recognized that in the case before it, the form of environmental regulation asserted by the state was essentially an economic regulation: "[I]f local authorities have the ability to impose 'environmental' permitting regulations on the railroad, such power will in fact amount to 'economic regulation' if the carrier is prevented from constructing, acquiring, operating, abandoning, or discontinuing a line." *Id.* at 1031. *See also, CSX Transp., Inc. v. Georgia Pub. Serv. Comm'n,* 944 F.Supp. 1573 (N.D.Ga.1996)(state regulation of railroad agency closings is preempted by the ICCTA).

To the extent the state law at issue here is viewed as requiring the railroad to undergo substantial capital improvements, such as upgrading its class of track, relocating its yards, or upgrading speed along

its "wyes," it is preempted by the ICCTA, which vests exclusive jurisdiction in the STB over such matters. In short, if there is to be a limit on the amount of time that a train is permitted to block a crossing, it must come from the federal government.

### E. Commerce Clause

█ The state statute also runs afoul of the Commerce Clause. The Commerce Clause gives Congress the power to "regulate Commerce with foreign Nations, and among the several States...." U.S. Const. Art. I § 8, cl. 3. The Commerce Clause, "even without implementing legislation by Congress is a limitation upon the power of the States." *Great Atl. and Pac. Tea Co. v. Cottrell,* 424 U.S. 366, 370–71, 96 S.Ct. 923, 47 L.Ed.2d 55 (1976); *see also Edgar v. MITE Corp.,* 457 U.S. 624, 640, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). Some state laws are valid, even though they impact interstate commerce. For example, a state law must be sustained if it "regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental ... unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)(citing *Huron Portland Cement Co. v. Detroit,* 362 U.S. 440, 443, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960)).

Despite the balancing test which the Supreme Court reiterated in *Pike,* in no event can a state law directly regulate interstate commerce. "The Commerce Clause ... permits only incidental regulation of interstate commerce by the States; direct regulation is prohibited." *Edgar,* 457 U.S. at 640, 102 S.Ct. 2629 (citing *Shafer v. Farmers' Grain Co.,* 268 U.S. 189, 199, 45 S.Ct. 481, 69 L.Ed. 909 (1925)). In *Edgar,* the Court struck down, as a direct regulation on interstate commerce, the Illinois Business Take–Over Act which required "a tender offeror to notify the Secretary of State and the target company

of its intent to make a tender offer and the terms of the offer 20 days before the offer becomes effective." *Edgar*, 457 U.S. at 624, 102 S.Ct. 2629. The Court found that the law had a sweeping extraterritorial effect. The Court specifically noted that "if Illinois may impose such regulations, so may other States; and interstate commerce in securities transactions generated by tender offers would be thoroughly stifled." *Id.* at 642, 102 S.Ct. 2629. Similarly, in *Shafer*, the Supreme Court held that "a state statute which by its necessary operation directly interferes with or burdens [interstate] commerce is a prohibited regulation and invalid, regardless of the purpose with which it was enacted." *Shafer*, 268 U.S. at 199, 45 S.Ct. 481.

 The state statute at issue here directly regulates trains on their tracks. In a case similar to the one at bar, the United States Supreme Court struck down an Arizona state statute which restricted the length of passenger and freight trains to a certain number of cars. *Southern Pac. Co. v. Arizona*, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945). The Court found that the purported safety justifications for the law were not supported on the record. *Id.* at 775, 65 S.Ct. 1515. The following language from the Court's opinion makes clear why that statute unduly burdened commerce:

> The unchallenged findings leave no doubt that the Arizona Train Limit Law imposes a serious burden on the interstate commerce conducted by the appellant. It materially impedes the movement of appellant's interstate trains through that state and interposes a substantial obstruction to the national policy proclaimed by Congress, to promote adequate, economical and efficient railway transportation service. [citing the Interstate Commerce Act] Enforcement of the law in Arizona, while train lengths remain unregulated or are regulated by varying standards in other states, must inevitably result in an impairment of uniformity of efficient railroad operation because the railroads are subjected to

regulation which is not uniform in its application.

*Southern Pacific*, 325 U.S. at 773, 65 S.Ct. 1515 (citation omitted).

The Court stressed the need for national uniformity:

> With such laws in force in states which are interspersed with those having no limit on train lengths, the confusion and difficulty with which interstate operations would be burdened under the varied system of state regulation and the unsatisfied need for uniformity in such regulation, if any, are evident.

*Id.* at 773, 65 S.Ct. 1515.

The Fourth Circuit, in *Kahn v. Southern Ry. Co.*, 202 F.2d 875 (4th Cir.1953), invalidated on Commerce Clause grounds a city ordinance which limited the amount of time a train could block a crossing to three minutes. The Court of Appeals noted that, as applied to moving trains, the result is to impermissibly limit the length of trains. *Id.* at 878. Further, the court stated, "if [the ordinance] was intended to apply to moving trains, then, in our opinion, the ordinance must be held to be invalid as contravening the commerce clause of the Federal Constitution." *Id.*, (citing *Southern Pacific*, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915). The *Kahn* Court recognized that the *Southern Pacific* decision "was based in part upon the voluminous evidence as to the injurious effect of the statute upon interstate traffic and the relative dangers attendant upon the operation of long and short trains." *Kahn*, 202 F.2d at 879. After making this observation, the court stated:

> Specific evidence of this kind is lacking in the pending case but it is nevertheless obvious that the regulation of the length of trains under a literal interpretation of the ordinances would result in an unconstitutional interference with the national commerce. No additional evidence is needed to show that the ordinances so construed come within the condemnation of the following passage from *Southern Pacific* . . . .

If one state may regulate train lengths, so may all the others, and they need not prescribe the same maximum limitation. The practical effect of such regulation is to control train operations beyond the boundaries of the state exacting it because of the necessity of breaking up and reassembling long trains at the nearest terminal points before entering and after leaving the regulating state. The serious impediment to the free flow of commerce by the local regulation of train lengths and the practical necessity that such regulation, if any, must be prescribed by a single body having a nation-wide authority are apparent.

*Kahn,* 202 F.2d at 879, (quoting *Southern Pacific,* 325 U.S. 761, 775, 65 S.Ct. 1515, 89 L.Ed. 1915).

Here, as in *Southern Pacific,* if every state were to enact legislation limiting the amount of time a railroad could block a crossing, a substantial burden would be placed upon interstate commerce. Depending on the amount of time each state allows, the railroads would have to limit the length of its trains, increase the train's speed, or implement higher grades of track at different points along its interstate routes. The practical effect of the regulation here is, like in *Southern Pacific,* "to control train operations beyond the boundaries of the state." *Id.* at 775, 65 S.Ct. 1515; *Seaboard Air Line Ry. Co. v. Blackwell,* 244 U.S. 310, 315–16, 37 S.Ct. 640, 61 L.Ed. 1160 (1917)(invalidating a Georgia statute requiring trains to nearly come to a complete stop fifty feet from a grade crossing on the grounds that it constituted an unlawful direct regulation of interstate commerce); *Kansas City S. Ry. Co. v. Kaw Valley Drainage Dist. of Wyandotte Co., Kansas,* 233 U.S. 75, 34 S.Ct. 564, 58 L.Ed. 857 (1914)(railroad cannot be ordered by the state to remove railroad bridges or raise them to higher heights and noting that the state cannot invoke the "convenient apologetics of the police power" in order to justify "a direct interference with commerce among the states." *Id.* at 79, 34 S.Ct. 564.).

At the time *Southern Pacific* was decided several states had legislation either in effect or pending which would limit the number of cars a train could pull. *Id.* at 774, n. 3, 65 S.Ct. 1515. Similarly here, independent research has revealed that fifteen other states have laws which limit the amount of time a train can block a crossing. *See, e.g.,* Arizona: A.R.S. § 40–852 (limiting time to 15 minutes with exceptions); Arkansas: A.C.A. § 23–12–1007 (limiting time to 10 minutes with exceptions); Georgia: Ga. Op. Att'y Gen. No. 70–58 (1970)(if railroad blocks a crossing for an unreasonable period of time, a public nuisance possibly occurs); Illinois: 625 ILCS 5/18c–7402 (limiting time to 10 minutes with exceptions); Indiana: IC 8–6–7.5–1 (limiting time to 10 minutes with exceptions); Kentucky: KRS § 277.200 (limiting time to 5 minutes with exceptions); Louisiana: LSA–R.S. 48.391–.392 (limiting time to 20 minutes with exceptions); Minnesota: M.S.A. § 219.383 (limiting time to ten minutes); Mississippi: Miss.Code Ann. § 77–9–235 (limiting time to 5 minutes); Missouri: V.A.M.S. 300.360 (limiting time to 5 minutes with exceptions); New York: NY Railroad § 53–c (limiting time to 5 minutes with exceptions); Ohio: Oh. St. § 5589.21 (limiting time to 5 minutes with exceptions); South Carolina: SC ST § 58–17–4080 (limiting time to 5 minutes); Texas: V.T.C.A. § 471.007 (limiting time to 10 minutes with exceptions); West Virginia: WV ST § 31–2A–2 (limiting time to 10 minutes with exceptions).[9]

Requiring substantial capital improvements as a form of compliance would di-

---

9. Two of the statutes have been held not to violate the Commerce Clause, albeit several years ago. *See, e.g., People v. Indiana Harbor Belt R.R. Co.,* 102 Ill.App.3d 811, 58 Ill.Dec. 162, 430 N.E.2d 104 (Ill.App.1981); *City of Lake Charles v. Southern Pac. Transp. Co.,* 310 So.2d 116 (La.Ct.App.1975). *But see, City of Cincinnati v. Luckey,* 153 Ohio St. 247, 91 N.E.2d 477 (Ohio Sup.Ct.1950)(invalidating city ordinance restricting amount of time train can block a crossing to ten minutes as an invalid exercise of city's police power).

rectly burden interstate commerce, and impermissibly subject railroads to differing obligations from state to state. *See also Kassel v. Consolidated Freightways Corp. of Delaware*, 450 U.S. 662, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981)(invalidating Iowa law barring use of trucks longer than sixty feet); *Raymond Motor Transp. Inc. v. Rice*, 434 U.S. 429, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978)(invalidating Wisconsin law barring operation of trucks in excess of sixty-five feet); *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959)(invalidating Illinois law requiring use of certain types of rear fender mudguards).

This Court is mindful of the fact that the Michigan Court of Appeals in *People v. Consolidated Rail Corp.*, 145 Mich.App. 707, 378 N.W.2d 581 (Mich.Ct.App.1985), held that the state statute at issue in this case did not violate the Commerce Clause as applied to "a single curve used by a single railroad." *Id.* at 714, 378 N.W.2d 581. The Court of Appeals was "unconvinced that the Commerce Clause should be applied to such local circumstances, which have little relevance to 'the interests of the nation in an adequate, economical and efficient railway transportation service.'" *Id.*, (quoting *Southern Pacific*, 325 U.S. at 783–84, 65 S.Ct. 1515). In *Consolidated Rail*, the court found *Kahn* unpersuasive on two grounds. First it noted that the argument that the statute imposed a length limitation on the trains coming around the curve was not persuasive because "Defendant has advanced no evidence that the state is somehow responsible for the curvature of the track." *Id.* at 714, 378 N.W.2d 581. This, the court contended, distinguished *Consolidated Rail* from *Kahn*, because the city ordinance in *Kahn* was coupled with another ordinance which limited a train's speed. "In combination, these ordinances amounted to a governmental limitation on the length of trains, contrary to the holding of *Southern Pacific*. . . ." *Consolidated Rail*, 145 Mich.App. at 714, 378 N.W.2d 581. Further, the court noted that in *Kahn*, "the ordinances applied to all rail-road companies and to all intersections within the city." *Consolidated Rail*, 145 Mich.App. at 714, 378 N.W.2d 581. The court noted that in the case at hand, "we have, at most, a de facto limitation on the length of defendant's trains at but one location, a restriction resulting not from the state's regulation, but from the curvature of the defendant's own track."

In sum, the court stated:

> The burden on interstate commerce, relegated solely to the effect on defendant's operation at one curve in a single city, is so slight that the presumption of validity is enough to sustain the statute. . . . For the sake of completeness, we note that it is beyond doubt that the public safety, health and welfare often hinge on the amount of time taken by police officers, firemen and other personnel to arrive at the scene of a crisis. Nor can it be doubted that a train crossing at an intersection may pose an obstacle to such responses. The statute furthers these purposes, despite defendant's arguments to the contrary.

*Id.* at 715, 378 N.W.2d 581 (citation omitted).

*Consolidated Rail* is not controlling on the facts at issue here. The court in that case stressed that its analysis was based only on one curve. The instant case involves many intersections, and the statute has state-wide applicability.

This Court is mindful of the state's historical role in the regulation of its local highways. However, the state statute at issue here directly regulates railroads, either by affecting the speed of their trains, the length of their trains, the performance of their federally-mandated air brake tests, or by requiring them to undergo substantial capital improvements in upgrading their class of track, or relocating their rail yards. The state's power to regulate highway safety does not reach so far as to require the railroad to effect such substantial changes. The Court understands the frustrations that motorists feel when they are inconvenienced by delays at railroad

crossings. However, the Court finds that, under the law, any limitation on the amount of time a train can block a crossing must come from the federal government.

## V. Conclusion

Being fully advised in the premises, having read the pleadings, and for the reasons set forth above, the Court hereby orders as follows:

Plaintiff's motion for summary judgment is GRANTED.

IT IS FURTHER ORDERED THAT Defendant City of Plymouth's motion for summary judgment is DENIED.

IT IS FURTHER ORDERED THAT Defendant Jennifer Granholm, Attorney General of the State of Michigan's motion for summary judgment is DENIED.

IT IS FURTHER ORDERED THAT Plaintiff's motion to strike the Attorney General's jury demand is DENIED AS MOOT.

IT IS FURTHER ORDERED THAT Plaintiff's motion to strike the Brickey Affidavit is DENIED.

SO ORDERED.